**SAMPSON & ASSOCIATES**
Bryan D. Sampson, Esq. (#143143)
Mary L. Fickel, Esq. (#221872)
2139 First Avenue
San Diego, California 92101
Tel. (619) 557-9420 / Fax (619) 557-9425
bsampson@sampsonlaw.net

Attorneys for Judgment Creditor
Richard A. Williamson

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD WILLIAMSON, Successor Liquidating Trustee of Lipper Convertibles, LP, <br><br> Plaintiff/Judgment Creditor, <br><br> v. <br><br> EDWARD STRAFACI, <br> . <br> Defendant/Judgment Debtor. | Case No. 07 MC 390 <br><br> **MOTION FOR AN ASSIGNMENT ORDER** <br><br><br> Date:   July 14, 2008 <br> Time:  10:30 a.m. <br> Ctrm:  1 <br> Judge: Hon. Irma E. Gonzalez. |

TO ALL PARTIES:

PLEASE TAKE NOTICE that Plaintiff/Judgment Creditor RICHARD WILLIAMSON, Successor Liquidating Trustee of Lipper Convertibles, L.P. (hereinafter "Creditor" and/or "Williamson"), will, and hereby does, move this Court, under Federal Rules of Civil Procedure, Rule 69, and California Code of Civil Procedure §708.510, for an order against Defendant/Judgment Debtor EDWARD STRAFACI (hereinafter "Debtor" and/or "Strafaci"):

    (1)    Assigning any and all rights, title and interest of Debtor Strafaci in any money now due to  him, or to become due in the future, from the class action lawsuit entitled <u>Sheldon, Dubroff and Mervyn Klien, et al. v. Wren Holdings, LLC, et al.</u>, under San Diego Superior Court Case Number GIC879495, directly to Creditor Williamson until the amount remaining due on the $89,828.416.00  judgment, plus all accrued interest and costs thereon, is paid in full; and

(2)      Directing Debtor to pay any and all money due, or to become due, under the assignment order, directly to Creditor until the amount remaining due on the $89,828.416.00 judgment, plus all accrued interest and costs thereon, is paid in full.

PLEASE TAKE FURTHER NOTICE that this motion is made pursuant to:

1.      A criminal judgment entered by the United States District Court, Southern District of New York, which was registered in this Court;

2.      Debtor Strafaci's refusal to voluntarily pay the judgment;

3.      Debtor Strafaci's interest in the <u>Sheldon, Dubroff and Mervyn Klien, et al. v. Wren Holdings, LLC, et al.</u> class action case;

4.      Federal Rules of Civil Procedure, Rule 69;

5.      California Code of Civil Procedure §708.510;

6.      On the grounds the judgment against Debtor is final and remains unsatisfied; and

7.      On the further grounds Creditor is unable to recover on his judgment absent judicial intervention.

PLEASE TAKE FURTHER NOTICE that this motion is based on this Notice and Motion, the pleadings, records and files int his action, the accompanying Memorandum of Points and Authorities, Exhibits and the Declarations of Richard A. Williamson and Bryan D. Sampson, and upon such further and other evidence as may be presented at or before the hearing on this motion.

Respectfully submitted,

DATED: May 23, 2008          **SAMPSON & ASSOCIATES**

By:    <u>/s/ Bryan D. Sampson</u>
Attorneys for Judgment Creditor
E-Mail: bsampson@sampsonlaw.net

2

S:\Company Files\Clients - Open\Williamson v. Strafaci\Pleading\Assignment Order\MOTION.wpd

1

**SAMPSON & ASSOCIATES**
Bryan D. Sampson, Esq. (#143143)

2

Mary L. Fickel, Esq. (#221872)
2139 First Avenue

3

San Diego, California 92101
Tel. (619) 557-9420 / Fax (619) 557-9425

4

bsampson@sampsonlaw.net

5

Attorneys for Judgment Creditor
Richard A. Williamson

6

7

8

### UNITED STATES DISTRICT COURT

9

### SOUTHERN DISTRICT OF CALIFORNIA

10

RICHARD WILLIAMSON, Successor
Liquidating Trustee of Lipper Convertibles, LP,

11

Case No. 07 MC 390

12

Plaintiff/Judgment Creditor,

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR AN ASSIGNMENT ORDER**

13

v.

14

EDWARD STRAFACI,
.

Date:   July 14, 2008
Time:  10:30 a.m.
Ctrm:   1

15

Defendant/Judgment Debtor.

Judge: Hon. Irma E. Gonzalez

16

17

### INTRODUCTION

18

Plaintiff/Judgment Creditor RICHARD WILLIAMSON, Successor Liquidating Trustee of Lipper

19

Convertibles, L.P. (hereinafter "Creditor" and/or "Williamson") hereby submits the following

20

Memorandum of Points and Authorities in support of his Motion for an Assignment Order against

21

Defendant/Judgment Debtor EDWARD STRAFACI (hereinafter "Debtor" and/or "Strafaci") based upon

22

the following facts and law.

23

Creditor Williamson has a criminal restitution judgment entered by the United States District

24

Court, Southern District of New York, which is registered in this Court, Debtor refuses to voluntarily

25

pay the judgment, and Debtor holds an interest in the <u>Sheldon, Dubroff and Mervyn Klien, et al. v. Wren</u>

26

<u>Holdings, LLC, et al.</u> class action case. Thus, an assignment order may issue under Federal Rules of

27

Civil Procedure, Rule 69, and California Code of Civil Procedure §708.510, and on the grounds the

28

judgment against Debtor is final and remains unsatisfied.

1

<u>Williamson  v. Strafaci</u>  Case No. 07 MC 390
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR AN ASSIGNMENT ORDER**
S:\Company Files\Clients - Open\Williamson v. Strafaci\Pleading\Assignment Order\P&A.wpd

# FACTUAL BACKGROUND

## Debtor's Underlying Criminal Conduct.

On August 11, 2004, Debtor Strafaci pleaded guilty to Count One, Securities Fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff and Title 17, Code of Federal Regulations, Section 2.40.10b-5. See Exhibit "1" and Declaration of Richard Williamson.

Debtor Strafaci had been employed at Lipper Holdings, LLC, an investment company made up of various partnerships, as an Executive Vice-President and Director of Fixed Income Money Management. See Exhibit "1" and Declaration of Richard Williamson. Debtor Strafaci was responsible for trading convertible securities, and determining and reporting values of the securities for the investors relating to two investment funds. Id. Specifically, Debtor Strafaci was required to prepare annual and quarterly reports to the investors outlining the investors' net profits and losses and the two funds. Id. The reports prepared by Debtor Strafaci were to be in compliance with Lipper Holdings, LLC's guidelines. Id. Debtor Strafaci was paid based upon the funds success. Id.

However, during the course of his employment, Debtor Strafaci fraudulently overvalued the funds he was responsible to manage for his investors, causing the investors to believe their investments were growing rapidly, when they were actually losing money. See Exhibit "1" and Declaration of Richard Williamson. Between 1998-2001, Debtor Strafaci received over $4 Million in bonuses, based upon his fraudulent misrepresentation of the valuation of the funds. Id. In 2002, Debtor Strafaci abruptly quit his job at Lipper Holdings, LLC. Id. Soon after Debtor Strafaci's departure, Lipper Holdings, LLC discovered Debtor Strafaci's fraudulent overvaluation of the funds. Id. As a result of the foregoing, Lipper Holdings, LLC was forced to liquidate the funds. Creditor Williamson was appointed as the liquidating Trustee. Id.

## The Judgment in a Criminal Case.

On May 26, 2005, after the criminal indictment of Debtor Strafaci, the United States District Court, Southern District of New York, entered a Restitution Order against Debtor Strafaci, in the principal sum of $89,828,416.00. See Court Records (Registration of Judgment in Another District) and Declaration of Richard Williamson. Creditor Williamson then registered the New York judgment in this Court on July 30, 2007. Id.

**Debtor's Interest in the Class Action Lawsuit.**

In the course of conducting investigation on Debtor Strafaci, Creditor Williamson learned Debtor Strafaci was a shareholder in Streaming Media Corporation. See Exhibit "2" and Declaration of Richard Williamson.  Creditor Williamson further learned Debtor Strafaci was a Plaintiff member in a class-action lawsuit entitled Sheldon Dubroff and Mervyn Klein, et al. v. Wren Holdings, LLC, et al. (hereinafter "Sheldon Dubroff matter") in the Superior Court of California, County of San Diego, Case Number GIC8979495. See Exhibit "3" and Declarations of Richard Williamson and Bryan D. Sampson.

The Sheldon Dubroff matter involves a class-action lawsuit filed on behalf of the shareholders of Nine Systems Corporation fka Streaming Media Corporation against Wren Holdings, LLC.  It is currently being litigated in the California State Court.  See Exhibit "3" and Declarations of Richard Williamson and Bryan D. Sampson.  Upon conclusion of the Sheldon Dubroff class action matter, either through litigation or through settlement, Creditor Williamson anticipates Debtor Strafaci may receive monies from the suit.  See Declaration of Bryan D. Sampson.  Therefore, on August 8, 2007, Creditor Williamson filed a Notice of Lien in the Sheldon Dubroff matter.  See Exhibit "4" and Declaration of Bryan D. Sampson.

**The Balance Due Under the Judgment.**

The balance due on the final New York judgment, as of the date of this motion, exceeds eighty-nine million, eight hundred twenty-eight thousand, four hundred sixteen dollars ( $89,828,416.00). See Court Records (the July 30, 2007, Registered Judgment).

As a result of this matter, Debtor Strafaci is currently being held in a federal prison.  He has disclosed no real or personal assets available to satisfy Creditor Williamson's judgment.  He further fails and/or refuses to pay any monies toward this judgment, despite Creditor's reasonable meet and confer attempts.  See Declarations of Richard Williamson and Bryan D. Sampson.

Based upon the foregoing, Creditor Williamson requests the Court issue an Assignment Order requiring that any monies now due, or to become due in the future, to Debtor Strafaci from the Sheldon Dubroff matter to be assigned directly to Creditor Williamson.  Creditor further requests the Order be valid until such time as the judgment is paid in full or the order is amended by the Court.  See Exhibit "5" (proposed Assignment Order).

**LEGAL ARGUMENT**

**A.     The Court Has Proper Jurisdiction Over This Matter.**

This Court has jurisdiction over this matter based upon the registration in this Court on July 30, 2007, of a final judgment entered in the United States District Court, Southern District of New York. 28 U.S.C. §1963; <u>see</u> also Court Records.  The United States District Court, Southern District of New York has original jurisdictions over this matter under 28 U.S.C. §1331.  Creditor's Judgment  is based upon, *inter alia*, a restitution award arising out of Debtor's Securities Fraud.  <u>Id</u>.

**B.     The Court May Issue an Assignment Order.**

Federal Rules of Civil Procedure Rule 69 addresses the enforcement of money judgments obtained in Federal Courts.  Generally, the judgments are enforced under the laws of the state in which the Federal Court is held.  <u>See</u> F.R.C.P. 69(a).

In California, a judgment creditor may bring a motion for an assignment order against a judgment debtor's accounts receivable and all or part of a right to payment now due or to become due in the future. C.C.P. §708.510.  An assignment order is designed to judicially assign rights to payments owed to a judgment debtor from a third party directly to the judgment creditor.  All or part of a payment due, or to become due, may be ordered assigned, whether or not such right is conditioned upon future development.  C.C.P. §708.510(a).  The total amount of the assignment, however, is limited to the amount owed on the judgment.  C.C.P. §708.510(d).

**C.     Debtor's Receivables May be Assigned.**

The types of rights to payment which may be assigned include, but are not limited to, accounts receivable, commissions, royalties, bonus plans, stocks, bonds, deferred compensation and/or insurance payments.  <u>See</u> C.C.P. §708.510(a)(1)-(6); Comment to C.C.P. §708.510 & <u>Ahart</u>, <u>Cal.Prac.Guide:</u> <u>Enforcing Judgment and Debts</u>, §§6:1422 &  6:1423 (The Rutter Group 2007).

As more fully set forth above, Debtor Strafaci is a Plaintiff class member and, therefore, has an interest in the Sheldon Dubroff matter.  <u>See</u> Exhibits "2-3."  Sometime in the future, Debtor Strafaci may receive monies from the Sheldon Dubroff  matter.  <u>See</u> Declaration of Bryan D. Sampson.  Thus, the Court may order assignment of the right to payment in an amount necessary to pay off the judgment in full, including accrued interest.

D.    **An Assignment Order is Reasonable**.

Moreover, an assignment of monies due, including from a pending lawsuit, is fair under the circumstances.  Creditor is currently owed $89,282,416.00, plus post judgment interest and costs.  See Court Records.  Further, Debtor Strafaci has failed and/or refused to pay any portion of this debt.  See Declaration of Bryan D. Sampson.  Debtor Strafaci has no disclosed real or personal assets sufficient to satisfy this judgment.  Id.

This leaves Creditor with no ability to collect on this judgment absent judicial intervention. Although Creditor Williamson filed a Notice of Lien in Debtor Strafaci's class action lawsuit, the lien is only valid while the action is pending.  If the matter settles out of court, or the action is dismissed prior to payment, the pending action lien is no longer valid.  See C.C.P. §708.410(d).  In order to fully secure Creditor's lien in the lawsuit, Creditor needs an assignment order issued.  Therefore,  it is reasonable and fair for the Court to order an assignment of interest in monies now due, or to become due in the future, to Debtor as set forth in the proposed Order.  Otherwise, Creditor is left with no adequate remedy under the law to enforce the judgment.

## CONCLUSION

Based upon the foregoing, Creditor respectfully request this Court grant the attached, proposed order against Debtor Strafaci as set forth at Exhibit "5."

Respectfully submitted,

DATED: May 23, 2008                    **SAMPSON & ASSOCIATES**


By:    /s/ Bryan D. Sampson
       Attorneys for Judgment Creditor
       E-Mail: bsampson@sampsonlaw.net

**Williamson  v. Strafaci  Case No. 07 MC 390**
**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR AN ASSIGNMENT ORDER**
S:\Company Files\Clients - Open\Williamson v. Strafaci\Pleading\Assignment Order\P&A.wpd

1  **SAMPSON & ASSOCIATES**
   Bryan D. Sampson, Esq. (#143143)
2  Mary L. Fickel, Esq. (#221872)
   2139 First Avenue
3  San Diego, California 92101
   Tel. (619) 557-9420 / Fax (619) 557-9425
4  bsampson@sampsonlaw.net

5  Attorneys for Judgment Creditor
   Richard A. Williamson
6

7

8                **UNITED STATES DISTRICT COURT**

9              **SOUTHERN DISTRICT OF CALIFORNIA**

10

11  | | |
    |---|---|
    | RICHARD WILLIAMSON, Successor Liquidating Trustee of Lipper Convertibles, LP, | Case No. 07 MC 390 |
    | Plaintiff/Judgment Creditor, | **DECLARATION OF RICHARD A. WILLIAMSON IN SUPPORT OF MOTION FOR AN ASSIGNMENT ORDER** |
    | v. | Date:  July 14, 2008 |
    | EDWARD STRAFACI, | Time:  10:30 a.m. Ctrm:  1 |
    | Defendant/Judgment Debtor. | Judge: Hon. Irma E. Gonzalez |

16      I, Richard A. Williamson, declare:

17      1.      I am an attorney licensed to practice law in the State of New York.  I am also the

18  Successor Liquidating Trustee of Lipper Convertibles, LP and, in such capacity, the Plaintiff/Judgment

19  Creditor in this action against Debtor Edward Strafaci.

20      2.      If called upon to testify, I could and would competently testify to the matters

21  contained herein based upon my personal knowledge.

22                              **Exhibits**

23      3.      Attached to the Index of Exhibits at Exhibit "1" is a true and correct copy of Debtor

24  Strafaci's Criminal Indictment, dated October 23, 2003.

25      4.      Attached to the Index of Exhibits at Exhibit "2" is a true and correct copy of Debtor

26  Strafaci's  shareholder certificate for Streaming Media Corporation.

27      5.      Attached to the Index of Exhibits at Exhibit "3" is a true and correct copy of the Sheldon

28  Dubroff and Mervyn Klein, et al. v. Wren Holdings, LLC, et al. class action complaint.

**DECLARATION OF RICHARD A. WILLIAMSON IN SUPPORT OF MOTION FOR AN ASSIGNMENT ORDER**
S:\Company Files\Clients - Open\Williamson v. Strafaci\Pleading\Assignment Order\Final.Dec.RW.wpd

6.     Attached to the Index of Exhibits at Exhibit "4" is a true and correct copy of the Notice of Lien filed on August 8, 2007.

7.     Attached to the Index of Exhibits at Exhibit "5" is a true and correct copy of Creditor's proposed Assignment Order.

### Factual Background

8.     **Debtor Strafaci's Employment.**  Debtor Edward Strafaci ( "Debtor" and/or "Strafaci") was employed as an Executive Vice-President and Director of Fixed-Income Money Management by an investment company that served as general partner of Lipper Convertibles, L.P. and several other limited partnership hedge funds.

9.     Debtor Strafaci oversaw all aspects of the general partner's investment strategy and functioned as the portfolio manager for two funds, including Lipper Convertibles.  Among his duties, Debtor Strafaci determined values of the securities held by the funds, which were reported to the funds' investors.  Reported net profits and losses for the funds were based on the valuations provided by Debtor Strafaci.  Strafaci represented to management and the investors that, among other things, his valuations were performed in conformance with the limited partnership agreements of the funds, including the limited partnership agreement of Lipper Convertibles.

10.     Debtor Strafaci was paid and given bonuses based, in part, upon the performance of these two funds.  In fact, between 1998-2001, Debtor Strafaci received $3.9 million in bonuses based, in part, on the "success" of these two funds.

11.     On or about January 14, 2001, Debtor Strafaci abruptly announced to the general partner he was leaving the firm.

12.     Soon thereafter, the general partner discovered substantial deviations between the "bid and ask" prices quoted by prominent convertibles securities market makers and the values assigned by Strafaci to the same securities before his departure.  Upon investigation, it was learned Debtor Strafaci had fraudulently and artificially inflated the market value and performance of the funds since 1995.

13.     As a result of the foregoing, the general partner was forced to inform the investors in 2002 that Lipper Convertibles' securities' portfolio was overstated by approximately 40%.  In March 2002, the general partner announced it was dissolving Lipper Convertibles and the other fund, and

Williamson  v. Strafaci  Case No. 07 MC 390
**DECLARATION OF RICHARD A. WILLIAMSON IN SUPPORT OF MOTION FOR AN ASSIGNMENT ORDER**
S:\Company Files\Clients - Open\Williamson v. Strafaci\Pleading\Assignment Order\Final.Dec.RW.wpd

shortly thereafter it liquidated all of the securities held by both funds.

14.    **The Criminal Indictment.**  On or about October 23, 2003, Debtor Strafaci was indicted on four counts of stock fraud.  On or about August 11, 2004, Debtor Strafaci entered a guilty plea to count one of the indictment for securities fraud in violation of Title 15, United States Code, Sections 78j(b) and 78ff and Title 17, Code of Federal Regulations, Section 10 b-5.

15.    **The Judgment in a Criminal Case**..  On May 26, 2005, after Debtor's criminal indictment and guilty plea, the United States District Court, Southern District of New York, entered judgment against Debtor.  He was sentenced to a term of 72 months in prison and ordered to make restitution to the limited partners of Lipper Convertibles, in the amount of $89,828,416.00.

16.    **Registration of the Judgment.**  The New York Judgment was registered in this Court on July 30, 2007.

17.    **Judgment Enforcement/Debtor Strafaci's Interest in the Class-Action Lawsuit**.  In the course of my efforts to enforce the Judgment against Debtor Strafaci, I learned Debtor Strafaci was a shareholder in Streaming Media Corporation and he was a member of the class to be certified in a class-action lawsuit entitled Sheldon Dubroff and Mervyn Klein, et al. v. Wren Holdings, LLC, et al., in the Superior Court of California, County of San Diego, Case Number GIC8979495.

18.    The Shedon Dubroff matter involves a class-action lawsuit filed on behalf of the shareholders of Nine Systems Corporation fka Streaming Media Corporation against Wren Holdings, and is currently being litigated.

19.    Upon conclusion of the Sheldon Dubroff matter, I understand Debtor Strafaci may be entitled to payment of a portion of any recovery obtained in the Sheldon Dubroff class action.

20.    Based upon the foregoing, I instructed my attorney of record in California to file a Notice of Lien in the Sheldon Dubroff matter on August 8, 2007, which has been done.

21.    The Judgment as of the date of this motion, exceeds $89,828,416.00. Debtor Strafaci has thus far made only nominal payments toward satisfaction of this debt, in the amount of approximately $3,700.00. Debtor Strafaci is currently in federal prison as a result of his fraudulent conduct.  He has not disclosed his financial holdings and appears to have no real or personal assets to pay the Judgment.

I declare, under penalty of perjury under the laws of the United States, the foregoing is true

Williamson  v. Strafaci  Case No. 07 MC 390
**DECLARATION OF RICHARD A. WILLIAMSON IN SUPPORT OF MOTION FOR AN ASSIGNMENT ORDER**
S:\Company Files\Clients - Open\Williamson v. Strafaci\Pleading\Assignment Order\Final.Dec.RW.wpd

and correct.  This declaration is executed this ___20th___ day of May 2008, in New York, New York.

Richard A. Williamson

1  **SAMPSON & ASSOCIATES**
   Bryan D. Sampson, Esq. (#143143)
2  Mary L. Fickel, Esq. (#221872)
   2139 First Avenue
3  San Diego, California 92101
   Tel. (619) 557-9420 / Fax (619) 557-9425
4  bsampson@sampsonlaw.net

5  Attorneys for Judgment Creditor
   Richard A. Williamson
6

7

8                **UNITED STATES DISTRICT COURT**

9               **SOUTHERN DISTRICT OF CALIFORNIA**

10  RICHARD WILLIAMSON, Successor      | Case No. 07 MC 390
    Liquidating Trustee of Lipper Convertibles, LP,
11                                     | **DECLARATION OF BRYAN D. SAMPSON**
12          Plaintiff/Judgment Creditor, | **IN SUPPORT OF MOTION FOR AN**
                                        | **ASSIGNMENT ORDER**
13  v.                                  |
                                        | Date:  July 14, 2008
14  EDWARD STRAFACI,                    | Time:  10:30 a.m.
    .                                   | Ctrm:  1
15          Defendant/Judgment Debtor.  | Judge: Hon. Irma E. Gonzalez

16

17      I, Bryan D. Sampson, declare:

18      1.      I am an attorney licensed to practice law in the State of California, and before this Court.

19  I am a principal of Sampson & Associates, attorney's of record in California for Plaintiff/Judgment

20  Creditor Richard Williamson, Liquidating Trustee of Lipper Convertibles, L.P. (hereinafter "Creditor"

21  and/or "Williamson") in the above-captioned matter against Defendant/Judgment Debtor Edward

22  Strafaci (hereinafter "Debtor" and/or "Strafaci") to enforce the judgment, in the sum of $89,828,416.00,

23  entered by the United States District Court, Southern District of New York, which was registered in this

24  Court on July 30, 2007.

25      2.      If called upon to testify, I could and would competently testify to the matters contained

26  herein based upon my personal knowledge, except as to those matter stated upon information and belief,

27  and as to those matters I am informed and believe and thereon allege that they are true and correct based

28  upon my reasonable investigation.

1

**Williamson  v. Strafaci  Case No. 07 MC 390**
**NOTICE OF MOTION AND MOTION FOR AN ASSIGNMENT ORDER**
S:\Company Files\Clients - Open\Williamson v. Strafaci\Pleading\Assignment Order\BDS.wpd

**Exhibits**

3.     Attached to the Index of Exhibits at Exhibit "1" is a true and correct copy of Debtor Strafaci's Criminal Indictment.

4.     Attached to the Index of Exhibits at Exhibit "2" is a true and correct copy of Debtor Strafaci's shareholder certificate for Streaming Media Corporation.

5.     Attached to the Index of Exhibits at Exhibit "3" is a true and correct copy of the <u>Sheldon Dubroff and Mervyn Klein, et al. v. Wren Holdings, LLC, et al.</u> class action complaint.

6.     Attached to the Index of Exhibits at Exhibit "4" is a true and correct copy of the Notice of Lien filed on August 8, 2007.

7.     Attached to the Index of Exhibits at Exhibit "5" is a true and correct copy of Creditor's proposed Assignment Order.

**Factual Background**

8.     I, on behalf of Creditor Williamson, conducted a thorough investigation on Debtor Strafaci. I discovered Debtor Strafaci is, and at all relevant times was, a shareholder in Streaming Media Corporation. In addition, Debtor Strafaci is, and at all relevant times was, a Plaintiff in a class action lawsuit entitled <u>Sheldon Dubroff and Mervyn Klein, et al. v. Wren Holdings, LLC, et al.</u> ("Sheldon Dubroff matter") brought on behalf of shareholders of Nine Systems Corporation fka Streaming Media Corporation. The Dubroff matter is pending in San Diego Superior Court, case number GIC879495.

9.     Based upon the foregoing, I registered the Creditor Williamson's United States District Court, Southern District of New York, judgment in this Court. Creditor Williamson then filed a Notice of Lien in the Sheldon Dubroff matter on August 8, 2007, in the State Court.

10.     The judgment as of the date of this motion exceeds $89,828.416.00.

11.     I have attempted to meet and confer with Debtor to resolve this matter informally. He has failed to respond to any of my communications.

I declare, under penalty of perjury under the laws of the United States, the foregoing is true and correct. This declaration is executed this 22nd day of May 2008, in San Diego, California.

By:     /s/ Bryan D. Sampson
        Bryan D. Sampson, Esq.

2

1  **SAMPSON & ASSOCIATES**
   Bryan D. Sampson, Esq. (#143143)
2  Mary L. Fickel, Esq. (#221872)
   2139 First Avenue
3  San Diego, California 92101
   Tel. (619) 557-9420 / Fax (619) 557-9425
4  bsampson@sampsonlaw.net

5  Attorneys for Judgment Creditor
   Richard A. Williamson
6

7

8                 **UNITED STATES DISTRICT COURT**

9                **SOUTHERN DISTRICT OF CALIFORNIA**

10 RICHARD WILLIAMSON, Successor          Case No. 07 MC 390
   Liquidating Trustee of Lipper Convertibles, LP,
11                                        **INDEX OF EXHIBITS IN SUPPORT OF**
12            Plaintiff/Judgment Creditor, **MOTION FOR AN ASSIGNMENT ORDER**

13 v.
                                          Date:  July 14, 2008
14 EDWARD STRAFACI,                       Time:  10:30 a.m.
   .                                      Ctrm:  1
15            Defendant/Judgment Debtor.  Judge: Hon. Irma E. Gonzalez

16

17        Creditor Williamson submits the following documents to the Court.

18 <u>Exhibit</u>          <u>Description</u>

19 "1"              Criminal Indictment of Debtor Strafaci.

20 "2"              Debtor Strafaci's Shareholder Certificate for Streaming Media Corporation.

21 "3"              <u>Sheldon Dubroff and Mervyn Klein, et al. v. Wren Holdings, LLC,e t al</u> Class

22                  Action Complaint for: 1. Breach of Fiduciary Duty; and 2. Constructive Fraud.

23 "4"              Notice of Lien filed on August 8, 2007.

24 "5"              [Proposed] Assignment Order.

25                              Respectfully submitted,

26 DATED: May 23, 2008          **SAMPSON & ASSOCIATES**

27
                     By:   /s/ Bryan D. Sampson
28                         Attorneys for Judgment Creditor
                          E-Mail: bsampson@sampsonlaw.net

                                    1

# EXHIBIT "1"

CRL        COPY OF INDICTMENT AGAINST LIPPER'S STRAFACI FOR STOCK FRAUD
           Oct 29 2003  11:36


(The following is a reformatted version of a court document
issued by U.S. District Court, Southern District of NY and
received via electronic mail. The document was confirmed by the
sender.)

UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

        UNITED STATES OF AMERICA                    :
        INDICTMENT
        -v-                          :

        EDWARD STRAFACI,                     :
        03 Cr.
        :
        Defendant.
        :
- - - - - - - - - - - - - - - - - -x


          COUNT ONE

        (Securities Fraud).

        The Grand Jury charges:
              The Relevant Parties And Entities
        1.      At all times relevant to this Indictment, Lipper
Holdings, LLC ("Lipper Holdings"), a Delaware limited liability
company headquartered in New York, New York, was in the business
of investing in securities on behalf of individual and
institutional clients. Lipper Holdings served as the general
partner for several limited partnerships made up of individual
and institutional clients, including Lipper Convertibles, L.P.
and Lipper Convertibles Series II, L.P. (collectively "the
Convertible Funds"). As general partner of the Convertible Funds,
Lipper Holdings was vested with authority under limited
partnership agreements to manage all aspects of the Convertible
Funds' business and operations, including decisions relating to
the purchase and sale of securities.

        2. At all times relevant to this Indictment, Lipper
Convertibles, L.P. (the "LC Fund"), was a New York limited
partnership in the business of investing funds. The LC Fund
originally commenced business under the name Cohen, Feit & Co. on
October 22, 1985, subsequently changed its name to Lipco
Partners, L.P., and then in 1997, was renamed Lipper
Convertibles. At all times relevant to this Indictment, the LC

Copyright (c) 2003

Fund was registered as a broker-dealer with the National
Association of Securities Dealers ("NASD"). Investment in the
fund was open to individuals whose investable assets exceeded $5
million, entities that owned or invested on a discretionary basis
at least $25 million, and trusts for which the settler and
trustee were individuals whose investable assets exceeded $5
million.

     3. At all times relevant to this Indictment, Lipper
Convertibles Series II (the "LC Fund Series II") was a New York
limited partnership in the business of investing funds. The LC
Fund Series II initially commenced business on September 1, 1998,
and was open to a maximum of 100 "accredited investors," i.e.,
individuals with a net worth of over $1 million or income of over
$200,000 in the prior two years ($300,000 jointly for married
individuals), and corporate entities. At all times relevant to
this Indictment, the LC Fund Series II was registered as a broker-
dealer with the NASD.

     4. At all times relevant to this Indictment, EDWARD
STRAFACI, the defendant, served as Lipper Holdings' Executive
Vice President and Director of Fixed Income Money Management. In
that capacity, STRAFACI oversaw all aspects of Lipper Holdings'
investment strategy, and functioned as the portfolio manager for,
among other funds, the LC Fund and the LC Fund Series II. In
addition, STRAFACI was responsible for determining the current
market values for the convertible securities held in these funds,
and also functioned as Lipper Holdings' Chief Compliance Officer.
     The Convertible Funds
     5. The Convertible Funds -- the LC Fund and the LC Fund
Series II -- purported to employ the same investment strategy. In
general, this investment strategy consisted of using leverage or
debt to purchase the convertible securities of a particular
issuer while simultaneously hedging that position by selling the
same issuer's common stock short.

     6. A "convertible security" is a corporate bond or preferred
stock which pays periodic interest payments (for bonds) or
dividend payments (for preferred stock), and which can be
exchanged at the option of the holder into the common stock of
the issuer at a preset ratio on certain terms. Some convertible
securities trade on a national exchange, such as the New York
Stock Exchange; nearly all other convertible securities trade in
the "over-the-counter" market, in which dealers publicly quote
"bids," i.e., prices at which they will purchase the securities
from the market, and "asks" or "offers," i.e., prices at which
they will sell the securities to the market, and transactions are
then consummated by the dealers with the seller or purchaser.

Copyright (c) 2003

7. A "short sale" of common stock is a transaction in which an investor sells shares of common stock that the seller does not own. Such sales typically are made in anticipation of a decline in the price of the common stock to enable the seller to cover the sale with a purchase at a later date, at a lower price, and thus at a profit.

8. Both the LC Fund and the LC Fund Series II held a portfolio of: (a) long positions in convertible securities, and (b) short positions in the common stock of the companies that issued the convertible securities. During the period relevant to the Indictment, Lipper Holdings represented to investors that it held short positions worth approximately 70 to 80 percent of the value of its long convertible positions.

9. The combination of these two types of positions was expected to produce so-called "static income" or steady income, because the convertible securities yielded interest payments or dividends which were expected to exceed any interest or other costs arising from holding the convertible securities and the short common stock positions. At the same time, this "hedged" position was expected to guard against major losses resulting from large movements in the price of the common stock. In particular, the convertible securities were expected to rise in value if the price of the issuer's common stock rose, thus offsetting any losses in the short common stock positions. On the other hand, if the price of the common stock dropped, the Convertible Funds would profit on the short positions, thus offsetting any losses in the convertible securities.

10. In addition to the "static income" discussed above, the Convertible Funds also engaged in so-called "gamma" trading, which involved trading in securities to generate additional profits by taking advantage of market movements.

11. During the period relevant to the Indictment, Lipper Holdings assured investors that given its hedging strategy, its investments were substantially market-neutral, and therefore that movements in the stock price of the securities would not result in large losses to the Convertible Funds. As Lipper Holdings explained in its May 2001 Private Offering Memorandum for the LC Fund:

The Partnership attempts to realize a profit by capturing the cash flow differential between the yield on an issuer's convertible security and the dividend on its underlying common equity security in a relatively market-neutral strategy. This is accomplished by setting up positions that attempt to be relatively neutral as to the direction of the stock market and the price for the underlying common equity. Each "set-up"

Copyright (c) 2003

consists of a long position in the convertible security and a
short position in the underlying common equity. These "set-ups"
are designed to create a positive cash flow due to the yield
advantage of the convertible security in comparison to the
underlying common equity of the same issuer and the use of
substantial leverage to increase this cash flow. . . . The
Partnership expects its short position to provide significant
protection from downward movements in the market price of the
underlying common equity.

    12. Further, in marketing the fund to investors, Lipper
Holdings and its employees, including STRAFACI, represented that
the Convertible Funds were relatively conservative investments
from which investors could expect returns of between 10 and 12
percent a year, and in which their investment principal would be
largely protected.
    The Limited Partnership Agreements
    13. In managing the LC Fund and the LC Fund Series II,
Lipper Holdings was obligated to comply with the limited
partnership agreement governing each of the funds. Under the two
limited partnership agreements, Lipper Holdings was required on a
quarterly and annual basis to provide each limited partner with
information on the partnership's balance sheet, its net profits
or losses for the prior period, as well as a statement of the
limited partner's capital account, including net profits or
losses allocated to that capital account. Each limited
partnership agreement provided that the funds would pay to Lipper
Holdings certain management fees, as well as annual incentive
compensation fees equal to 20 percent of annual net profits.

    14. Both the LC Fund and the LC Fund Series II limited
partnership agreements provided that net profits or losses were
to include all realized profits and losses, i.e., profits or
losses on actual sales, and unrealized profits and losses, i.e.,
profits or losses on securities that were still held in the
portfolio. Under the limited partnership agreements, unrealized
losses were to be calculated by comparing the "market value" of
each investment on the date of the report with the "market value"
of the investment on the date of the previous report.
    15. The LC Fund and the LC Fund Series II limited
partnership agreements contained slightly different language on
how the "market value" of each security was to be determined.
However, each one required that the market value of securities
listed on national exchanges be valued at the closing price on
that exchange on the day of the valuation and that securities
traded over the counter be valued between the range of the "bids"
and the "asks" quoted by dealers in that security. In particular:

Copyright (c) 2003

a. The LC Fund limited partnership agreement provided that:
(a) for securities listed on a national securities exchange or
quoted on the NASDAQ National Market System, the securities were
to be valued at "their last sales price on the principal exchange
on which such securities are listed or quoted"; (b) for
securities traded over-the-counter (but not traded or quoted on a
national securities exchange or the NASDAQ National Market
System), the securities were to be valued "between the last `bid'
and `asked' price for such security as determined by the General
Partner in its reasonable discretion"; and (c) for all other
securities, the securities were to be valued "by the General
Partner in its reasonable discretion." The agreement also
provided that any deviation from this valuation methodology must
be documented in writing in the records of the partnership. The
records of the LC Fund contained no documentation of any such
deviation.

b. The LC Fund Series II partnership agreement provided
that: (a) securities listed on a national securities exchange
which were freely transferable were to be valued "at their last
sales price on the principal exchange on which such [s]ecurities
are listed"; (b) securities traded over-the-counter that were
freely transferable were to be valued "in the case of `long'
positions, at their last `bid' price and, in the case of `short'
positions, at their last `asked' price, as reported by the
National Association of Securities Dealers, Inc.'s Automatic
Quotation System or, if not quoted on such system, by one of the
principal market makers in such [s]ecurity selected by the
General Partner, in its sole discretion"; (c) if the fund held a
block of a securities which could not be liquidated within a
reasonable time without depressing the market, the security was
to be valued by the General Partner, "but not at a unit value in
excess of (in the case of a `long' position) or less than (in the
case of a `short' position) the quoted market price for such
[s]ecurity"; and (d) all other securities were to be valued "in
good faith by the General Partner on the basis of the opinion of
at least one Person, not an affiliate of General Partner, who, in
the reasonable determination of the General Partner, is qualified
to render an opinion as to the value of such assets."
    Strafaci's Role In Determining Market Value For Convertible
Securities

16. Twice each month, from at least in or about 1994 until
in or about January 2002, EDWARD STRAFACI was responsible for
determining the appropriate market value for each convertible
security held in the LC Fund and the LC Fund Series II

Copyright (c) 2003

portfolios. Prior to pricing the portfolios, STRAFACI obtained market value data from several different sources, including: (a) national securities exchanges; (b) market makers in the securities; (c) the firms at which the Convertible Funds held the convertible securities; and (d) recent trades in the securities, including trades by the Convertible Funds. STRAFACI then would determine the proper market value to be assigned to each convertible security. When securities were held in both the LC Fund and the LC Fund Series II portfolios, Lipper Holdings used the same market value for each fund.

17. Once STRAFACI determined the market value to assign to the convertible securities, STRAFACI's prices or "marks" were used to calculate the unrealized gains or losses sustained by the Convertible Funds portfolios during the preceding period. In addition, STRAFACI's prices ultimately were used to determine the Convertible Funds's performance during the prior period.

18. During the period relevant to this Indictment, STRAFACI represented to Lipper Holdings's management and employees, as well as to investors and others, that: (a) he was valuing each convertible security in the Convertible Funds portfolios in conformance with the partnership agreements described above; (b) he was basing his pricing in large measure on the market values being quoted by the market makers in the convertible securities; and (c) the market values he assigned to nearly every security fell within the range of the bids and asks quoted by the different market makers, or were based on prices at which the securities traded in transactions that occurred near the date on which STRAFACI determined the market values.

Lipper Holdings' Reports To Investors
About The Performance Of The Convertible Funds

19. During the period relevant to the Indictment, limited partners in the Convertible Funds received monthly reports which included: (1) the current value of their investments; (2) the year-to-date performance in percentage terms; and (3) the percentage returns from the inception of their investment to the date of the report. In addition, Lipper Holdings prepared financial statements on an annual basis for each of the Convertible Funds. The financial statements, which were audited by an accounting firm, represented that the securities held in the portfolios were being valued in the financial statements "at market." The figures contained in these reports and financial statements were based on the market values assigned to the convertible securities by STRAFACI.

20. From 1995 to 2000, based on STRAFACI's market

Copyright (c) 2003

valuations, the LC Fund reported to investors positive annual
gross profits (before payment of performance fees to the General
Partner) and net profits (after payment of performance fees to
the General Partner) as follows:

| DATE | GROSS PROFITS | NET PROFITS |
|------|---------------|-------------|
| 1995 | 19.7% | 15.7% |
| 1996 | 15.4% | 12.3% |
| 1997 | 21.4% | 17.1% |
| 1998 | 12.6% | 10.1% |
| 1999 | 12.9% | 10.3% |
| 2000 | .12.2% | 9.7% |

In addition, as of November 30, 2001, the LC Fund reported
for the year 2001 gross returns of 7.68%. Further, from 1995 to
January 2002, the LC Fund reported a monthly net profit in all
but three months.

21. Similarly, from 1998 to 2000, based in large measure on
STRAFACI's market valuations, the LC Fund Series II reported to
investors positive yearly gross profits (before payment of
performance fees to the General Partner) and net profits (after
payment of performance fees to the General Partner) as follows:

| YEAR | GROSS PROFITS | NET PROFITS |
|------|---------------|-------------|
| 1999 | 18.21% | 14.57% |
| 2000 | 11.57% | 9.26% |

In addition, as of November 30, 2001, the LC Fund Series II
reported for the year 2001 gross returns of 10.43%.

22. In marketing the Convertible Funds to prospective
investors, Lipper provided investors with a Private Offering
Memorandum which contained information regarding the Convertibles
Funds' historical performance as described above. Based on this
positive historical performance data, numerous individuals and
institutional clients invested in the Convertible Funds, and
existing clients invested additional funds.

23. During the period relevant to this Indictment,
STRAFACI's compensation was determined based, in part, on the
performance of the Convertible Funds, which in turn depended upon
STRAFACI's valuation of the market value of the assets held in
each fund. From 1998 to 2001, he was paid a base salary of
$150,000. In addition, he received the following yearly bonuses:
(a) 1998: $850,000; (b) 1999: $1,050,000; (c) 2000: $1,150,000;
and (d) 2001: $850,000.

STRAFACI's Misrepresentation Of
The Market Value Of The Convertible Funds Portfolios

24. From at least in or about 1996, until in or about
January 2002, EDWARD STRAFACI engaged in a scheme to fraudulently

Copyright (c) 2003

and artificially inflate the market value and performance of the
Convertible Funds by assigning market values to convertible
securities that were well above the range of prices actually
available in the market. As noted above, STRAFACI represented to
Lipper management and investors that: (1) he was valuing each
convertible security in the Convertible Funds portfolios in
conformance with the limited partnership agreements described
above; (2) he was basing his pricing in large measure on the
market values being quoted by the market makers; and (3) the
market values he assigned to nearly every security fell within
the range of the bids and asks quoted by the market makers or
were based on prices at which the securities traded in
transactions that occurred near the date on which STRAFACI
determined the market value. In fact, from in or about 1996 until
in or about 1999, in order to improve the performance of the
Convertible Funds, STRAFACI initiated a deceptive and fraudulent
scheme to assign falsely inflated market values to many
convertible securities in the Convertible Funds portfolios that
were above: (1) the range of bids and asks being quoted by market
makers; (2) the price of recent transactions in the convertible
securities; and (3) the actual market value of the securities.

     25. Further, in or about 2000 and 2001, in order to conceal
very substantial losses in the market value of the convertible
securities, EDWARD STRAFACI assigned market values to many
convertible securities in the Convertible Funds portfolios that
were substantially above the range of bids and asks being quoted
by market makers, the prices of recent transactions in the
convertible securities, and the actual market value of the
securities. In fact, by the end of 2000, and throughout 2001,
STRAFACI assigned prices to more than one-third of the
convertible securities held by the Convertible Funds that were
more than 10% above a reasonable market valuation, and in a
substantial number of cases, assigned prices that were more than
20% above a reasonable market valuation.

     26. The fraudulent overvaluation of these numerous
individual securities had a substantial effect on the combined
value of the convertible securities held in the Convertible Funds
portfolios. In fact, the total value of the convertible
securities held in the LC Fund portfolio reported to investors
were overvalued: (a) as of December 31, 2000, by approximately 12
percent; and (b) as of November 30, 2001, by approximately 16
percent. Similarly, the convertible securities in the LC Fund
Series II portfolio were overvalued: (a) as of December 31, 2000,
by approximately 6 percent; and (b) as of November 30, 2001, by
approximately 12 percent.

Copyright (c) 2003

27. In addition, because the portfolios were leveraged, these fraudulent overvaluations had an even larger effect on the limited partners' capital, i.e., the value of the limited partners' investments. For example, although Lipper Holdings reported to the LC Fund investors in its 2000 financial statements that as of December 31, 2000, the total partnership capital was approximately $568 million, the actual partnership capital was approximately $288 million, or approximately 49% less than reported. Similarly, although Lipper Holdings reported to the LC Fund investors as of November 30, 2001, that the total partnership capital was approximately $722 million, the actual partnership capital was approximately $392 million, or approximately 45% less than reported.

28. As a result of the scheme to overvalue assets and conceal losses, STRAFACI caused the Convertible Funds to provide performance reports and financial statements to both investors and potential investors which substantially overstated the performance of the Convertibles Funds and the value of the Convertible Funds convertible securities portfolios and partnership capital. In reliance on the performance reports and financial statements, investors were fraudulently induced to hold interests and make additional investments in the Convertible Funds during the course of the scheme. Similarly, new investors were fraudulently induced to invest in the Convertible Funds based on these false performance reports and financial statements.

The Liquidation Of The Convertible Funds Portfolios

29. On or about January 14, 2002, STRAFACI abruptly informed Lipper Holdings that he was leaving the firm. Very soon after his departure, Lipper Holdings management discovered a substantial deviation between the bid and ask prices quoted by several prominent convertible securities market makers as of December 31, 2001, and the market values assigned by STRAFACI prior to his departure to those same securities as of December 31, 2001. Thereafter, Lipper Holdings conducted an internal review of the market values assigned by STRAFACI, and concluded that many of STRAFACI's market values were not within a reasonable range of the actual market values. STRAFACI refused to cooperate in this review.

30. On or about February 20, 2002, Lipper Holdings announced to its investors that after conducting a review of the market values assigned to convertible securities in the LC Fund and the LC Fund Series II portfolios, it had determined that the LC Fund's net asset value should be reduced by approximately 40%, and that the LC Fund Series II's net asset value should be

Copyright (c) 2003

reduced by approximately 15%.

31. On or about March 26, 2002, Lipper Holdings informed its investors that it had decided to dissolve the LC Fund and the LC Fund Series II limited partnerships, and to sell all of their holdings. Over the next few weeks, all of the securities owned by the Convertible Funds were liquidated at or near contemporaneous bid prices. Whereas Lipper Holdings at November 30, 2001, had recorded the partnership capital of the LC Fund at approximately $722 million, by the time the liquidation was complete in April 2002, the partnership capital had decreased to approximately $365 million. Similarly, although at November 30, 2001, Lipper Holdings had recorded the partnership capital of the LC Fund Series II at approximately $29.5 million, by the time the liquidation was complete in April 2002, the partnership capital had decreased to approximately $21.1 million.

32. In or about mid-2002, Lipper Holdings retained a public accounting firm to recalculate the month-end value and partnership capital of the LC Fund from January 1, 1995, to December 31, 2001, based on market prices the accounting firm deemed appropriate. Based on the data generated in that analysis, Lipper Holdings' actual returns during that period were much lower than the returns reported to investors. For example, while the LC Fund reported to investors an annual gain in 2000 of 9.76%, in actuality, according to this analysis, the fund lost 6.86% of its value that year.

33. In addition, although Lipper Holdings each year reported to investors that the Convertible Funds had positive net returns, most investors in the Convertible Funds will receive between 70% and 90% of their original investments as a result of the liquidation of the Convertible Funds.

Statutory Violation

34. From in or about 1996, until in or about January 2002, in the Southern District of New York and elsewhere, EDWARD STRAFACI, the defendant, unlawfully, willfully, and knowingly, by the use of the means and instrumentalities of interstate commerce and of the mails, directly and indirectly, in connection with the purchase and sale of securities, i.e., interests in the LC Fund, did use and employ manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b 5, by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business that

Copyright (c) 2003

operated and would operate as a fraud and deceit upon persons,
namely purchasers of limited partnership interests in the LC
Fund.

        (Title 15, United States Code, Sections 78j(b) & 78ff;
        Title 17, Code of Federal Regulations, Section 240.10b
5; and

        Title 18, United States Code, Section 2).


        COUNT TWO

        (Securities Fraud)
    The Grand Jury further charges:
    35. The allegations contained in paragraphs 1 through 33 of
this Indictment are realleged and incorporated as if fully set
forth herein.
    36. From in or about 1999, until in or about January 2002,
in the Southern District of New York and elsewhere, EDWARD
STRAFACI, the defendant, unlawfully, willfully, and knowingly, by
the use of the means and instrumentalities of interstate commerce
and of the mails, directly and indirectly, in connection with the
purchase and sale of securities, i.e., interests in the LC Fund
Series II, did use and employ manipulative and deceptive devices
and contrivances in violation of Title 17, Code of Federal
Regulations, Section 240.10b 5, by: (a) employing devices,
schemes, and artifices to defraud; (b) making untrue statements
of material facts and omitting to state material facts necessary
in order to make the statements made, in the light of the
circumstances under which they were made, not misleading; and (c)
engaging in acts, practices, and courses of business that
operated and would operate as a fraud and deceit upon persons,

    namely purchasers of limited partnership interests in the LC
Fund Series II.
        (Title 15, United States Code, Sections 78j(b) & 78ff;
        Title 17, Code of Federal Regulations, Section 240.10b
5; and

        Title 18, United States Code, Section 2).

    COUNT THREE
        (Fraud Under the Investment Advisers Act)
    The Grand Jury further charges:
    37. The allegations contained in paragraphs 1 through 33 of
this Indictment are realleged and incorporated as if fully set
forth herein.
    38. From in or about 1996, until in or about January 2002,

Copyright (c) 2003

in the Southern District of New York and elsewhere, EDWARD
STRAFACI, the defendant, unlawfully, willfully, and knowingly, by
the use of the means and instrumentalities of interstate commerce
and of the mails, directly and indirectly, did cause an
Investment Adviser, namely, Lipper Holdings, (1) to employ
devices, schemes, and artifices to defraud clients and
prospective clients, and (2) to engage in transactions,
practices, and courses of business which operated as a fraud and
deceit upon clients and prospective clients, the LC Fund and its
limited partners.

         (Title 15, United States Code, Sections 80b-6(1), 80b-
6(2)

         & 80b-17; and Title 18, United States Code, Section 2).


         COUNT FOUR

         (Fraud Under the Investment Advisers Act)
    The Grand Jury further charges:
    39. The allegations contained in paragraphs 1 through 33 of
this Indictment are realleged and incorporated as if fully set
forth herein.
    40. From in or about 1999, until in or about January 2002,
in the Southern District of New York and elsewhere, EDWARD
STRAFACI, the defendant, unlawfully, willfully, and knowingly, by
the use of the means and instrumentalities of interstate commerce
and of the mails, directly and indirectly, did cause an
Investment Adviser, namely, Lipper Holdings, (1) to employ
devices, schemes, and artifices to defraud clients and
prospective clients, and (2) to engage in transactions,
practices, and courses of business which operated as a fraud and

    deceit upon clients and prospective clients, the LC Fund
Series II and its limited partners.
         (Title 15, United States Code, Sections 80b-6(1), 80b-
6(2)

         & 80b-17; and Title 18, United States Code, Section 2).


_____        _____
FOREPERSON                         JAMES B. COMEY
United States Attorney

(km) PN
                              -END-

Copyright (c) 2003

CRL        COPY OF INDICTMENT AGAINST LIPPER'S STRAFACI FOR STOCK FRAUD
           Oct. 29 2003  11:36


#<662235.940960>#
-0- (CRL) Oct/29/2003 16:36 GMT

Copyright (c) 2003

# LIPPER & COMPANY, L.P.
## 101 PARK AVENUE
## NEW YORK, NEW YORK 10178

---

TEL.: (212) 883-6333                 FAX:     (212)883-8703

## FAX COVER PAGE

DATE: _____ October 29, 2003 _____

TO: _____ Elkan Abramowitz _____

COMPANY: _____

FAX NO.: _____ (212) 898-~~5611~~ 0366 _____

FROM: _____ Peggy Smith _____

NUMBER OF PAGES INCLUDING COVER SHEET: _____ 4 _____

********

REMARKS: _____ 2 articles _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

EXHIBIT "2"



No. 63

Incorporated under the laws of the State of Delaware

100,000

# STREAMING MEDIA CORPORATION

Total Authorized Issue
50,000,000 Shares $.01 Par Value
Common Stock

This is to certify that _____ EDWARD & LINDA STRAFACI, Jointly

_____ 100,000 (one hundred thousand) _____ is the owner of _____

fully paid and non-assessable shares of the above Corporation transferable only on the books of the Corporation by the holder thereof in person or by a duly authorized Attorney upon surrender of this Certificate properly endorsed.

Witness, the seal of the Corporation and the signatures of its duly authorized officers.

Dated May 30, 2002

_____ President

_____ Secretary

CORPEX, NEW YORK

See Reverse for Certain Definitions

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

| | | | |
|---|---|---|---|
| TEN COM | — as tenants in common | UNIF GIFT MIN ACT — | ............ Custodian ............ |
| TEN ENT | — as tenants by the entireties | | (Cust) (Minor) |
| JT TEN | — as joint tenants with right of survivorship and not as tenants in common | | under Uniform Gifts to Minors Act ........................... (State) |

Additional abbreviations may also be used though not in the above list.

*For value received,_____ hereby sell, assign, and transfer unto*

PLEASE INSERT SOCIAL SECURITY OR OTHER
IDENTIFYING NUMBER OF ASSIGNEE

(PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS INCLUDING POSTAL ZIP CODE OF ASSIGNEE)

*_____ Shares*

*represented by the within Certificate, and do hereby
irrevocably constitute and appoint*

*_____ Attorney
to transfer the said Shares on the books of the within named
Corporation with full power of substitution in the premises.
Dated _____*

*In presence of*

NOTICE: THE SIGNATURE TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATEVER.

EXHIBIT "3"

1    Laurence M. Rosen (SBN 219683)
     THE ROSEN LAW FIRM. P.A.
2    350 Fifth Avenue. Suite 5508
     New York. New York 10118
3    Tel:   (212) 686-1060
     Fax:   (212) 202-3827
4

5    Kenneth J. Catanzarite (SBN 113750)
     Jim Travis Tice (SBN 153867)
     CATANZARITE LAW CORPORATION
6    2331 West Lincoln Avenue
     Anaheim. California 92801
7    Tel:   (714) 520-5544
     Fax:   (714) 520-0680
8

     Attorneys for Plaintiffs
9

10           **IN THE SUPERIOR COURT OF CALIFORNIA**
            **FOR THE COUNTY OF SAN DIEGO**
11

12    SHELDON DUBROFF and MERVYN KLEIN       Case No.
     on behalf of themselves and all others similarly
13    situated,                              CLASS ACTION COMPLAINT FOR:

14                                       1.      Breach of Fiduciary Duty; and
              Plaintiffs,                    2.      Constructive Fraud
15

16             vs.                                   JURY TRIAL DEMANDED

17    WREN HOLDINGS LLC, a Delaware limited
     liability company,   JAVVA PARTNERS LLC, a
18    New York limited liability company,
     CAMERON FAMILY PARTNERS, L.P. a
19    Delaware limited partnership, CATALYST
     INVESTORS, L.P., a Delaware limited
20    partnership, CHRISTOPHER SHIPMAN, an
     individual, ANDREW T. DWYER, an
21    individual, DORT A. CAMERON, III, an
     individual; HOWARD KATZ, an individual;
22    TROY SNYDER, an individual; NINE
     SYSTEMS CORPORATION, a Delaware
23    corporation, f/k/a Streaming Media Corporation,
     and DOES 1 through 50, inclusive,
24

25             Defendants.
26

27 ————————————————

28    //

**Table of Contents**

Page No.

I.      Introduction and Overview ............................................... 1.

II.     Jurisdiction and Venue .................................................. 5.

III.    Parties ................................................................. 5.

IV.     Class Action Allegations ............................................... 9.

V.      Factual Background ..................................................... 10.

        A.      The Initial Financing of NSC .................................... 10.

VI.     Defendants Never Provided Full Disclosure of the Self-dealing Transactions to
        Minority Shareholders ................................................. 12.

VII.    Defendants' Misconduct Damaged Class Members .......................... 16.

        A.      Duties of the Individual Defendants ............................ 17.

        B.      Duties of the Controlling Shareholders ........................ 17.

VIII.   Direct Claims for Relief

        First Cause of Action [Breach of Fiduciary Duty Against NSC's Directors and
        Officers, and NSC, including Does 1 to 50] ............................ 17.

        Second Cause of Action [Breach of Fiduciary Duty Owed By Majority Controlling
        Shareholders Towards Minority Shareholders including Does 1 to 50] ..... 19.

        Third Cause of Action [Constructive Fraud against All Defendants, including
        Does 1 to 50] ......................................................... 20.

IX.     Prayer for Relief ...................................................... 21.

Demand for Jury Trial ........................................................ 21.

**COMPLAINT**

1    Plaintiffs, by and through their attorneys, allege, based upon personal knowledge as to

2    themselves and their own acts and, as to other matters, based on information and belief derived

3    from the investigation of counsel as follows:

4    I.

5    **INTRODUCTION AND OVERVIEW**

6    1.    This is a class action brought on behalf of all persons who were minority

7    shareholders of Nine Systems Corporation ("NSC" or the "Company") formerly known as

8    Streaming Media Corporation ("SMC ") a privately held corporation. Plaintiffs were minority

9    shareholders common and Series A preferred stock of NSC, having paid approximately $6.2

10    million to acquire their shares in several private transactions with the Company during the years

11    1999 through 2001.

12    2.    Defendants are former directors, officers and controlling shareholders of NSC

13    who breached their fiduciary duties to the minority shareholders by secretly enriching themselves

14    through a series of self-interested  transactions that wrongfully enabled Defendants to gain

15    ownership of more than 80% of the equity value of the Company, transferring the bulk of the

16    minority shareholders' equity value to Defendants and causing the minority shareholders to suffer

17    over $40.0 million in damages.

18    3.    By the time plaintiff minority shareholders learned of the breach in November

19    2006, Defendants had managed to arrange to sell the Company and pocket over $135 million for

20    themselves - much of it rightfully belonging to plaintiffs.

21    4.    Plaintiffs assert claims against the defendants, each of whom is or was an director,

22    officer and/or control person of the Company and who owned or controlled entities that together

23    were majority controlling shareholders of the Company  for, *inter alia,* breaching their fiduciary

24    duties as directors, officers and/or majority shareholders to Plaintiffs, the minority shareholders

25    of NSC.

26    5.    Defendants, directors and controlling shareholders of the Company,  breached

27    their fiduciary duties to minority shareholders by taking  more than 80% of the equity value of

28    the Company for themselves by initiating a series of undisclosed self-dealing transactions

1  causing the Company to issue to Defendants vast amounts of convertible preferred stock at a per

2  share price far below fair-market value.

3       6.    The purpose and effect of Defendants' self-dealing transactions was to reduce the

4  minority shareholders' equity interest in the Company to a tiny fraction of its original value

5  causing substantial financial loss, while correspondingly increasing the self-dealing Defendants'

6  equity interest in the Company, without Defendants' paying fair consideration.

7       7.    The controlling shareholders were comprised of NSC directors (1) Howard Katz,

8  (2) Christopher Shipman and (3) Dort Cameron, (4) NSC's Chief Executive Troy Snyder, several

9  entities controlled by NSC directors, including (5) Wren Holdings, LLC, (6) Javva Partners,

10  LLC, (7) Cameron Family Partners, L.P. and (8) Catalyst Investors, L.P. and (9) Andrew Dwyer,

11  an individual affiliated with Wren Holdings (collectively referred to herein as the "Controlling

12  Shareholders").

13       8.    These Controlling Shareholders, several of whom were also directors, possessed

14  control over the Company through their collective ownership of a majority of the Company's

15  voting stock and actual or constructive control of the Board of Directors of the Company and the

16  Company's affairs.

17       9.    Defendants issued to themselves the Company's convertible preferred stock at a

18  below market price  through a clever series of self-dealing related party transactions which

19  Defendants have euphemistically termed a "recapitalization" transaction and which is referred to

20  herein as the "Self-Dealing Transactions".

21       10.    Essentially, for no additional consideration, Defendants converted small loans to

22  the Company into a dramatically increased equity ownership position on a basis that was terribly

23  prejudicial to minority shareholders. Moreover these Self-Dealing Transactions were done

24  without the approval of, or disclosure to, the minority shareholders.

25       11.    In the first stage of the Self-Dealing Transactions, Defendants loaned small

26  amounts of money to the Company in the form of a series of promissory notes or subordinated

27  debt. The exact amount of the loans has never been disclosed by Defendants, but it is believed

28  not to exceed $2 million dollars.

12.    In the second stage, Defendants executed a 20 for 1 reverse stock split of all common shares, including the plaintiffs' shares. This meant that if a shareholder originally held 20 old shares, these would be converted into only 1 new share.

13.    In the third stage, Defendants converted their loans and notes into shares of new convertible preferred stock in the Company at a per share price far below fair-market value. The extraordinarily large number of common shares that the preferred shares Defendants issued to themselves could be converted into greatly increased Defendants' percentage equity ownership in the Company. Thus, Defendants were able to obtain more than 80% of the equity value of the Company for simply converting existing loans into convertible preferred stock.

14.    Defendants accomplished the Self-Dealing Transactions without providing *any* notice to minority shareholders of the transactions, without offering minority shareholders the right to loan money to the Company or purchase preferred stock on the same terms, and without submitting the Self-Dealing Transactions to a minority shareholder vote for approval.

15.    Nor, upon information and belief, did Defendants obtain an independent valuation of the Company to determine a fair per share price for the conversion of their notes and loans to the convertible preferred stock. Thus, Defendants have no independent basis to support the exceedingly low price at which they purchased the convertible preferred stock from the Company.

16.    Instead of convening a special committee of independent directors to negotiate and approve the Self Dealing Transactions, the regular Board of Directors, including the materially interested director-defendants negotiated and voted to approve the transactions.

17.    Instead of a majority of the minority shareholders voting to approve the Self-Dealing Transaction, the Controlling Shareholders alone voted to approve the transactions without any prior notice to minority shareholders.

18.    The Self-Dealing Transactions were accomplished in breach of Defendants' fiduciary duties owed to Plaintiffs and other minority shareholders.

19.    As a result of the Defendants' misconduct, the value of the plaintiff minority shareholders' interest in the Company was reduced by 80%.

1    20.    In November 2006, Akamai Technologies, Inc. ("Akamai") agreed to acquire

2  NSC through the purchase of all of NSC's outstanding stock for approximately $175 million of

3  Akamai securities.

4    21.    Of the $175 million total purchase price paid, the Defendants collectively received

5  approximately $136.5 million from the sale of their NSC stock to Akamai.

6    22.    The minority shareholders, after having the value of their equity interest in NSC

7  misappropriated by the Defendant Controlling Shareholders in the Self-Dealing Transactions,

8  eventually received collectively only about $10.5 million from the sale of their NSC stock to

9  Akamai.

10    23.    Absent the Controlling Shareholders' breach of fiduciary duty in executing the

11  Self-Dealing Transactions, Plaintiff minority shareholders would have received as much as $50

12  million or more from the sale of their stock to Akamai.

13                                      II.

14                        JURISDICTION AND VENUE

15    24.    This Court has jurisdiction over the causes of action asserted in this Complaint

16  pursuant to the California Constitution, Article VI, § 10, because this case is not a cause given by

17  statute to other trial courts.  The state law claims asserted herein arise under California and

18  Delaware common law.

19    25.    Venue is proper in this court as NSC is headquartered in this county, and the sham

20  corporate transaction that is the subject of this action took place in this county.

21                                      III.

22                              PARTIES

23    26.    Plaintiff Sheldon Dubroff is a resident and citizen of Florida and was a holder of

24  shares of the Company's common stock as of the date of the Self-Dealing Transactions until such

25  shares were purchased by Akamai Technologies in the acquisition of NSC which closed on or

26  about December 31, 2006.

27    27.    Plaintiff Mervyn Klein is a resident and citizen of New York and was a holder of

28  shares of the Company's common stock as of the date of the Self-Dealing Transactions until such

1  shares were purchased by Akamai Technologies in the acquisition of NSC which closed on

2  December 31, 2006.

3      28.    Defendant NSC, is a privately held Delaware corporation with its principal place

4  of business located 10509 Vista Sorrento Parkway, Suite 205, San Diego, California 92121.

5  NSC was formerly known as Streaming Media Corporation, until it changed its name to NSC as

6  part of the Self-Dealing Transactions. In December 2006, Akamai Technologies acquired all of

7  the outstanding equity securities of NSC in a stock for stock transaction valued at approximately

8  $175 million.

9      29.    Defendant Dort Cameron ("Cameron") is, and at all relevant times was, a member

10 of the Company's Board of Directors. Cameron is and was at all relevant times the managing

11 member and a principal owner of Wren Holdings LLC and Cameron Family Partners, L.P., two

12 of the controlling shareholders of the Company.   Cameron had a material interest in the Self-

13 Dealing Transactions as Wren Holdings and Cameron Family Partners were two of the entities

14 that received NSC preferred stock at a below market price.  Upon information and belief,

15 Cameron is a resident of Connecticut.

16     30.    Defendant Andrew T. Dwyer ("Dwyer") is, and at all relevant times was a

17 controlling shareholder of NSC. Dwyer had a material interest in the Self-Dealing Transactions

18 as he was one of the persons that received NSC preferred stock at a below market price. Dwyer is

19 and was at all relevant times an affiliate and 50% equity owner of Wren Holdings LLC.  Upon

20 information and belief, Dwyer is a resident of Connecticut.

21     31.    Defendant Howard Katz ("Katz") is, and at all relevant times was, a member of

22 the Company's Board of Directors. Katz is and was at all relevant times the managing member

23 and principal of Javva Partners LLC one of the controlling shareholders of the Company.   Katz

24 had a material interest in the Self-Dealing Transactions, as JAVVA Partners was one of the

25 entities that received NSC preferred stock at a below market price. Upon information and belief,

26 Katz is a resident of New York.

27     32.    Defendant Christopher Shipman ("Shipman") is, and at all relevant times was, a

28 member of the Company's Board of Directors. Shipman is and was at all relevant times the

1  managing partner of Catalyst Partners, L.P. one of the controlling shareholders of the Company.

2  Shipman had a material interest in the Self-Dealing Transactions as Catalyst Partners was one of

3  the entities that received NSC preferred stock at a below market.   Upon information and belief,

4  Shipman is a resident of New York.  At all times herein, Shipman acted as an agent of, and on

5  behalf of, Catalyst Partners, L.P.

6        33.     Defendant Troy Snyder ("Snyder") is, and at all relevant times was, the

7  Company's President, CEO, and member of the Board.  As a result of the Recapitalization,

8  Snyder was granted stock options for 530,000 shares of the Company's common stock.   As such,

9  he was materially interested in the Self-Dealing Transactions.  Upon information and belief,

10  Snyder is a resident and citizen of California.

11        34.     Defendants Cameron, Dwyer, Katz, Shipman and Snyder and Does 1 through 50

12  are collectively referred to herein as the "Individual Defendants".

13        35.     Defendant Wren Holdings LLC ("Wren") is a Delaware limited liability Company

14  with its principal place of business located in Connecticut.  Upon information and belief,

15  Defendant Dort Cameron is the managing member of Wren. Upon information and belief,

16  Cameron and Dwyer each own a 50% interest in Wren.  Wren had a material interest in the Self-

17  Dealing Transactions as Wren Holdings was one of the entities that received NSC preferred stock

18  at a below market price.

19        36.     Cameron Family Partnership, L.P ("CFP") is a Delaware limited partnership with

20  its principal place of business located , upon information and belief, in New York City.  Upon

21  information and belief, Defendant Dort Cameron is the managing partner and majority owner of

22  CFP. CFP  had a material interest in the Self-Dealing Transactions as it was one of the entities

23  that received NSC preferred stock at a below market price

24        37.     Defendant Javva Partners LLC ("Javva") is a New York limited liability Company

25  with its principal place of business located at 60 East 42nd Street, Suite 1313, New York, New

26  York, 10165.  Upon information and belief, Defendant Howard Katz is the managing member

27  and majority owner of Javva.   Javva had a material interest in the Self-Dealing Transactions, as

28  it was one of the entities that received NSC preferred stock at a below market price.

1    38.    Defendant Catalyst Investors, L.P. ("Catalyst") is a Delaware limited partnership

2  with its principal place of business located at 711 Fifth Avenue, Suite 405, New York, New York,

3  10022.  Catalyst had a material interest in the Self-Dealing Transactions, as it was one of the

4  entities that received NSC preferred stock at a below market price.  Upon information and belief,

5  Catalyst is controlled by Daniels & Associates, an entity that served as an investment banker for

6  the Company in a financing in early 2001.  Shipman was at all relevant times acting as an

7  employee and agent of Catalyst in connection with his approval and participation in the Self-

8  Dealing Transactions.

9    39.    Javva, Wren, Catalyst, and CFP are collectively referred to herein as the "Affiliated

10 Entities".

11    40.    Javva, Wren, Catalyst, CFP, each of the Individual Defendants and Does 1 though

12 50 are collectively referred to herein as the "Controlling Shareholders."

13    41.    At all times hereto, the Controlling Shareholders acted as a group of cont rolling

14 shareholders of the Company to control and dominate the Company and exert their will and power

15 over the Company and its board of directors to benefit themselves to the exclusion and detriment

16 of the minority stockholders.

17    42.    The true names and capacities of the unknown defendants named herein as Does 1

18 through 50, inclusive, are presently unknown to Plaintiffs and this Complaint will be amended to

19 insert their true names and capacities when the same has been ascertained.  Plaintiffs allege on

20 information and belief that Does 1 to 50 are persons and entities which either were directors of

21 NSC and knowingly approved the improper Self-Dealing Transactions or who received preferred

22 stock at a below market price pursuant to the Self-Dealing Transactions and are therefore

23 responsible to return the consideration received as alleged in this Complaint. The true names and

24 capacities will be obtained during the course of discovery and at that time said defendants shall be

25 specifically named.

26 //

27 //

28

o.
LC: 51900.301.01

COMPLAINT

8.

IV.

## CLASS ACTION ALLEGATIONS

43.    Plaintiffs bring this action as a class action pursuant to California Code of Civil Procedure §382 on behalf of all persons who owned the common stock and Series A preferred stock of the Company as of the date of the initiation of the Self-Dealing Transactions, which is believed to be August 1, 2002 (the "Class").

44.    Excluded from the Class are the Defendants, and any senior officers, directors and control persons of any Defendant, members of the immediate family of each of the individual Defendants, any subsidiary or affiliate of a Defendant or any entity in which any excluded person has a controlling interest, as well as the legal representatives, heirs, successors and assigns of any excluded person.

45.    While the exact number of Class members is unknown and can only be ascertained through appropriate discovery, Plaintiffs believe there are approximately 175 Class members. Thus, joinder of all Class members is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them.

46.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members because Defendants breached their fiduciary duties to all Class members in the same exact manner and each was damaged in the same manner. Among the questions of law and fact common to the Class are:

       a.  Whether Defendants breached their fiduciary duties to Class members;

       b.  Whether Defendants paid a fair consideration for the convertible preferred stock they received from the Company as part of the Self-Dealing Transactions;

       c.  Whether Defendants actions are protected by the business judgment rule;

       d.  Whether Defendants are able to prove the entire fairness of the Self-Dealing Transactions; and

       e.  Whether Plaintiffs and the other members of the Class have sustained damages

1    and, if so, the proper measure of those damages and whether Defendants actions caused

2    Plaintiffs to suffer damages.

3       47.    Plaintiffs' claims are typical of the claims of other Class members.   Plaintiffs and

4    the other Class members sustained damages arising out of Defendants' wrongful conduct.

5       48.    Plaintiffs will fairly and adequately protect the interests of the members of the

6    Class and have retained counsel competent and experienced in class actions and shareholder

7    litigation of this type.  Plaintiffs have no interests antagonistic to or in conflict with those of the

8    Class.

9       49.    Plaintiffs know of no difficulty that will be encountered in the management of this

10   litigation that would preclude its maintenance as a class action.  The names and addresses of Class

11   members are available from the books and records of the Company.  Notice can be provided to

12   such record owners via first class mail using techniques and forms of notice similar to those

13   customarily used in class actions.

V.

**FACTUAL BACKGROUND**

16   A.    <u>The Initial Financing of NSC</u>

17      50.    NSC was initially funded through the private investments of the plaintiff Class

18   members and the Defendants during the years 1999 through 2001.

19      51.    During 1999 through 2001 Defendants collectively purchased approximately

20   $4,500,000 in NSC common stock.

21      52.    During 1999 and early 2001, Plaintiffs purchased approximately $6,200,000 in

22   NSC common stock and promissory notes convertible into Series A preferred stock.  Plaintiffs'

23   promissory notes were converted to Series A preferred stock prior to August 1, 2002.

24      53.    Thus, defendants provided approximately 42% of NSC's invested capital and

25   Plaintiffs provided 58%, as of about February 28, 2001.

26      54.    As of November 2000, NSC did not have any outstanding debt or loans, as

27   reflected on NSC's balance sheet.

28   //

1    55.    Upon and information and belief, during 2001 and early 2002, the Controlling

2 Shareholders loaned approximately $2 million to the Company in the form of subordinated debt.

3    56.    On or about August 1, 2002, Defendants, engineered the series of Self-Dealing

4 Transactions.  NSC first implemented a 1-for-20 reverse stock split on all then outstanding shares

5 of common stock and Series A preferred stock of the Company.

6    57.    Following the reverse stock split, Defendants converted the outstanding

7 subordinated debt held by the Controlling Shareholders into an enormous quantity of shares of

8 convertible preferred stock, giving the Controlling Shareholders ownership of approximately 80%

9 of the equity value of the Company.

10    58.    The per share price at which the Controlling Shareholders' subordinated debt was

11 converted into preferred stock was well-below the stock's fair market value, transferring nearly all

12 of the Company's equity value to the Controlling Shareholders.

13    59.    In furtherance of this scheme, Defendants also caused the Company to issue large

14 amounts of very low priced stock options to Defendant Snyder and other NSC officers totaling

15 almost 10% of the outstanding equity of the Company.

16    60.    Defendants, through their control of the board of directors of the Company

17 implemented these Self-Dealing Transactions without any prior notice to plaintiffs or other

18 minority shareholders.

19    61.    Because at the time of the Self-Dealing Transactions Defendants owned and

20 controlled more than half of the voting stock of the Company, as well as controlling the board of

21 directors, Defendants never sought the Plaintiff minority shareholders' approval of the Self-

22 Dealing Transactions.

23    62.    Instead, the Controlling Shareholders, who controlled the NSC board of directors

24 caused the NSC Board of Directors to approve the Self-Dealing Transactions on terms dictated by

25 the Controlling Shareholders.

26    63.    Upon information and belief, no independent committee of the board was

27 convened to approve or negotiate the Self-dealing Transactions. Instead, the Controlling

28 Shareholders, who were also directors participated fully in all board action and votes of approval

1     concerning the Self-dealing Transactions, without any notice to the minority shareholders.

2         64.    The Controlling Shareholders, who owned a majority of the voting stock of the

3     Company also voted as shareholders to approve the Self-Dealing Transactions, without any notice

4     to, or approval of, the minority shareholders.

5         65.    Upon information and belief, immediately prior to the Self-Dealing Transactions,

6     Defendants collectively owned approximately 56% of the outstanding common stock of NSC.

7         66.    Immediately following the Self-Dealing Transactions, Defendants collective equity

8     ownership interest in the Company was *increased* to approximately 80% from the pre-transaction

9     level of about 56%, while the Plaintiffs equity ownership was *reduced* by approximately 80%.

10         67.    The Self-Dealing Transactions were the product of self-dealing because each of

11     Defendants Shipman, Katz and Cameron were members of the board of directors and/or

12     controlling shareholders of the Company at the time they approved and implemented the Self-

13     Dealing Transactions.

14         68.    Defendants Dwyer, Shipman, Katz and Cameron, as directors and/or controlling

15     shareholders of NSC, negotiated, authorized and approved the Self-Dealing Transactions, in

16     particular the conversion of the subordinated debt into convertible preferred stock by which 80%

17     of the Company's equity was vested in Defendants, and in which each director/defendant had a

18     material personal conflict of interest.

19                               VI.

20     **DEFENDANTS NEVER PROVIDED FULL DISCLOSURE OF THE SELF-DEALING**

21           **TRANSACTIONS TO MINORITY SHAREHOLDERS**

22         69.    Defendants never disclosed any of these adverse facts concerning the Self-Dealing

23     Transactions to plaintiffs until November 25, 2006, when NSC distributed proxy materials

24     soliciting shareholder approval of the acquisition of NSC by Akamai.

25         70.    Notice of the Self-Dealing Transactions was not given to any of the minority

26     shareholders in advance of its completion in August 2002.

27         71.    Defendants *never* disclosed to plaintiffs or the Class that the interested directors

28     and controlling shareholders had converted subordinated debt into a substantial portion of the

No.
CLC: 51900.301.01

1 Company's equity securities. Defendants *never* even disclosed to plaintiffs and the Class that

2 Defendants were the owners of subordinated debt of the Company.  Nor did Defendants *ever*

3 disclose the price at which such debt conversion was completed.

4        72.     Thus, prior to the proxy solicitation in November 2006, plaintiffs never had any

5 idea that Company insiders had engaged in the Self-dealing Transactions.  Nor were Plaintiffs

6 aware that they had been damaged by the Self-dealing Transactions, until they received a Proxy

7 solicitation in connection with Akamai's acquisition of the Company in November 2006.

8        73.     Disclosure of the Self-Dealing Transactions was not made to any minority

9 shareholders at any time prior to November 2006, and indeed to this day, as the minority common

10 stockholders have never been provided any of the details of the Self-Dealing Transactions,

11 including the amount of loans to be converted to preferred stock, the identities of the holders of

12 the loans, the price of the preferred stock in the conversion, nor any other terms of the Self-

13 Dealing Transactions.

14        74.     The minority shareholders were never given the opportunity to provide financing

15 for the Company on terms as or more favorable than the terms of Defendants' loans to the

16 Company or the price at which the Defendants' loans were converted into preferred stock of the

17 Company.

18        75.     Nor were the minority shareholders given any opportunity at all, as the Controlling

19 Shareholder Defendants were, to participate in the Self-Dealing Transactions, either by being

20 invited to provide loans, or purchase preferred stock on the same terms as Defendants in order to

21 protect their proportional equity interest in the Company .

22        76.     The Self-Dealing Transactions, as structured by the Controlling Shareholders

23 misappropriated nearly the entire equity value of the Company for the Controlling Shareholder

24 Defendants.

25        77.     The Controlling Shareholder Defendants through control of the Board of Directors,

26 negotiated with themselves and then obtained board and shareholder approval only from

27 themselves for the Self-Dealing Transactions that resulted in their obtaining ownership of

28 upwards of 80% of the Company for less than fair market value consideration, and with improved

1  liquidation rights.  Thus, the Self-Dealing Transactions were inherently unfair to the minority

2  shareholders.

3        78.     Moreover, upon information and belief, no independent valuation of the true worth

4  of the Company was made at the time of the Self-Dealing Transactions and there was no attempt

5  to have existing Controlling Shareholders share the reduction in equity ownership on a pro rata

6  basis.

7        79.     Upon information and belief, no independent committee of the board of directors

8  was convened to negotiate and approve the Self-dealing Transactions in an effort to mitigate the

9  Controlling Shareholders' domination and control of the board of directors and protect the

10  minority shareholders' interests.

11        80.     After the Self-Dealing Transactions were completed, sometime in late Fall 2002

12  Defendants sent a summary notice to plaintiffs and other minority shareholders stating only that a

13  reverse stock split and the issuance of preferred stock in exchange for the retirement of

14  subordinated debt had been completed, but provided no further details at all, other than that the

15  owners of outstanding convertible preferred shares would be entitled to 8,989,786 shares of NSC

16  common stock upon conversion.

17        81.     NSC never disclosed the total number of common or preferred shares outstanding

18  or the percentage of the total equity held by the common shareholders or preferred shareholders

19  following the Self-dealing Transactions.  Moreover, since certain minority shareholders held

20  Series A convertible preferred stock, it was impossible to determine exactly what portion of the

21  common shares issuable upon conversion of the preferred stock were owned by the Plaintiff

22  minority shareholders and what portion was owned by the persons who received convertible

23  preferred stock through conversion of the subordinated debt.

24        82.     Moreover, the 2002 notice did not disclose the identities of the owners of

25  subordinated debt who converted the debt and received convertible preferred stock or that they

26  were in fact insiders or the consideration paid for the convertible preferred stock or the amounts of

27  the loans that were converted.

28  //

1    83.    Thus, minority shareholders could not discern the effect of the Self-Dealing
2 Transactions on their percentage equity ownership in the Company.

3    84.    In addition, the notice, upon information and belief issued sometime in late 2002,
4 stated that SMC would be changing its name to Nine Systems and pursuing a new line of
5 business. Once again, Defendants never disclosed that Company insiders, directors and
6 controlling shareholders such as Defendants, were the former owners of the subordinated debt, or
7 that such insiders had converted their debt into preferred stock in a self-dealing transaction. Nor
8 did NSC or Defendants ever disclose the price at which the debt was converted to preferred stock.

9    85.    In late 2002, after the Company changed its name from Streaming Media to Nine
10 Systems, it relocated its business address and changed its phone number all without giving any
11 forwarding information to shareholders.

12    86.    For the next three and half years NSC provided *absolutely no information* to
13 Plaintiff minority shareholders: no annual or quarterly reports, no financial statements, no
14 corporate updates, no communications of any kind - nothing.

15    87.    The Company effectively disappeared from Plaintiff minority shareholders
16 beginning in late 2002 until February 2006.

17    88.    On February 9 , 2006, Troy Snyder, NSC's Chief Executive Officer disseminated
18 to plaintiffs and other class members a letter inviting shareholders to an informational meeting in
19 New York City scheduled for February 28, 2006.  The stated purpose of the meeting was to
20 discuss the Company's "financial results and current market position." In addition, the letter stated
21 that "I understand there has been sporadic shareholder confusion related to their shareholdings
22 after the reverse stock split three years ago.  While the number of shares you own has not changed
23 since the reverse stock split, we plan to send each shareholder a letter with their shareholdings
24 shortly after the informational meeting."

25    89.    NSC never disseminated to stockholders the promised letter delineating each
26 shareholders' shareholdings.

27    90.    The February 9, 2006 shareholder letter also attached financial statements for NSC
28 for the years ending June 2004 and 2005.

No.
CLC: 51900.301.01

1    91.    Prior to February 9, 2006, the Company had not released any financial statements

2 to shareholders since January of 2000.

3    92.    Then, on November 25, 2006, the Company disseminated proxy materials seeking

4 approval of the proposed acquisition of NSC by Akamai at a price that valued NSC at

5 approximately $175 million.

6    93.    The proxy materials also disclosed that Plaintiffs and the other minority

7 shareholders now held less than 6% of the Company's fully diluted equity securities and that

8 Defendant Controlling Shareholders now held over 77% of the Company's equity securities.

9    94.    Plaintiffs also were able to discern for the first time upon reading the November

10 25, 2006 proxy materials that Defendants had engaged in egregious self dealing in effecting the

11 Self-Dealing Transactions by which they obtained for themselves nearly 80% of the equity value

12 of the Company.

13                                      **VII.**

14            **DEFENDANTS' MISCONDUCT DAMAGED CLASS MEMBERS**

15    95.    The Self-Dealing Transactions were not completed in pursuit of any valid business

16 purpose, but rather were solely implemented to unjustly enrich the Defendant Controlling

17 Shareholders and their affiliated entities at the direct expense and to the financial detriment of

18 Plaintiff Class Members.

19    96.    The Self-Dealing Transactions were sham transactions designed to enrich the

20 Company's directors and controlling shareholders and their affiliated entities by expropriating the

21 entire value of the Company to the Controlling Shareholders (e.g. the Individual Defendants and

22 their Affiliated Entities).

23    97.    The Controlling Shareholders of the Company, by virtue of their collective

24 ownership of a majority of the Company's voting stock, and their actual control of the board of

25 directors and the affairs and conduct of the Company by virtue of their positions as officers and

26 directors, jointly acted to, and did in fact, cause the Company to enter into the Self-Dealing

27 Transactions with the purpose and intent to benefit themselves at the expense of the Plaintiff

28 Class of minority shareholders.

1    **A.    Duties of the Individual Defendants**

2    98.    Defendants Howard Katz, Dort Cameron, Christopher Shipman, and Troy Snyder

3    as officers and directors of NSC owed fiduciary duties to the plaintiff Class of minority

4    shareholders to ensure that the Self-Dealing Transactions did not unfairly benefit the

5    CONTROLLING SHAREHOLDERS to the detriment of the minority shareholders. In addition,

6    because certain of the recipients of preferred stock in the Self-Dealing Transactions were officers

7    and directors of the Company, Howard Katz, Dort Cameron, Christopher Shipman, and Troy

8    Snyder had a duty to ensure the entire fairness of the transaction to all shareholders.

9    **B.    Duties of the Controlling Shareholders**

10    99.    The CONTROLLING SHAREHOLDERS by virtue of their majority interest in the

11    Company's voting stock and their actual control over the Company's affairs and conduct had a

12    fiduciary responsibility to minority shareholders to use their ability to control the corporation in a

13    fair, just, and equitable manner.

14    100.    The CONTROLLING SHAREHOLDERS had a duty to ensure that their use of

15    control benefitted all shareholders equally and they had a duty to abstain from using their ability

16    to control corporate activities to benefit themselves alone or in a manner detrimental to the

17    minority.

18    101.    As CONTROLLING SHAREHOLDERS standing on both sides of the Self-

19    Dealing Transactions, they had a duty to ensure the entire fairness of the transaction to Plaintiffs

20    and other minority shareholders, irrespective of any purported business objective or business

21    judgment they exercised on behalf of the Company.

22    **VIII.**

23    **DIRECT CLAIMS FOR RELIEF**

24    **FIRST CAUSE OF ACTION**

25    **[Breach of Fiduciary Duty Against NSC's Directors and Officers, and NSC, including Does**

26    **1 to 50]**

27    102.    Plaintiffs adopt by reference ¶ 1 through 101 inclusive, and further allege and state

28    as follows:

No.
CLC: 51900.301.01

**COMPLAINT**

17.

1    103.    Each of the defendants who were directors and officers of NSC and NSC itself
2    herein owed fiduciary duties and were required to act in the best interests of the Company and its
3    shareholders.

4    104.    Defendants Cameron, Katz, Snyder and Shipman were each either directors or
5    executive officers NSC.  As such each owed fiduciary duties to Plaintiffs.  In negotiating the Self-
6    Dealing Transactions, they breached those duties by engaging in the transaction that: (1) was
7    fundamentally unfair to the Plaintiffs and the class; (2) failed to conduct a reasonable
8    investigation; (3) breached defendants' duty of care by not properly considering alternative
9    transactions, (4) was detrimental to the Company and common shareholders, (5) was not an
10   obligation of the Company, (6)  was replete with conflicts of interest; (7) had no legitimate
11   business purpose other than to transfer equity value of the Company at the detriment of the
12   Plaintiffs and the class; (8) breached the duty of loyalty to common shareholders by favoring
13   certain of the directors', officers' and Controlling Shareholders' interests to the detriment of
14   plaintiffs and (9) failed to disclose the material facts to the Plaintiffs and the class.

15   105.    The Company also had a fiduciary duty to the minority shareholders.

16   106.    Having breached their fiduciary duties by causing the Company to approve and
17   complete the Self-Dealing Transactions on fundamentally unfair terms, the Defendants then
18   further breached their fiduciary duty by failing to disclose all material facts concerning
19   transactions in which they had a financial interest.

20   107.    DOES 1 to 50 breached fiduciary duties owed to the Plaintiffs by and are therefore
21   equally liable to the Plaintiffs.

22   108.    In contemplating, planning and/or effecting the Self-Dealing Transactions, the
23   Defendants and DOES 1 to 50 were not acting in good faith toward Plaintiffs and breached their
24   fiduciary duties to Plaintiffs.

25   109.    As a result of the Defendants, and DOES 1 to 50's wrongful conduct, Plaintiffs
26   were damaged in an amount to be determined at the time of trial.

27   //
28   //

1

## SECOND CAUSE OF ACTION

2

[Breach of Fiduciary Duty Owed By Majority

3

Controlling Shareholders Towards Minority Shareholders

4

including Does 1 to 50]

5      110.    Plaintiffs adopt by reference ¶1 through ¶ 109 inclusive, and further allege and

6  state as follows:

7      111.    Each of the Controlling Shareholders herein, including Dwyer, Catalyst, Wren,

8  CFP and Javva, Shipman, Katz and Cameron owed fiduciary duties as Controlling Shareholders

9  of the Company and were required to act in the best interests of the minority shareholders and not

10  seek an advantage for the Controlling Shareholders to the detriment of the minority stockholders.

11      112.    Plaintiffs were minority stockholders of the Company at all relevant times herein..

12      113.    The Controlling Shareholders of NSC, owning in excess of 50% of the voting

13  stock of the Company, owed fiduciary duties to the minority shareholder Plaintiffs.  In addition,

14  the Controlling Shareholders controlled the NSC Board of Directors.

15      114.    The Controlling Shareholders, breached their duties by exercising their control and

16  causing NSC to engage in a patently unfair Self-Dealing Transactions that solely benefitted the

17  Controlling Shareholders and entities that either controlled or were affiliated with the Controlling

18  Shareholders.

19      115.    Defendants Dwyer, Catalyst, CFP, Javva and Wren were each Controlling

20  Shareholders of NSC and Katz, Shipman, Cameron and Dwyer were general partners or managing

21  members and were also the designated agents of entities that were themselves Controlling

22  Shareholders of the Company.  As such each owed fiduciary duties to Plaintiffs as majority

23  shareholders.

24      116.    In negotiating, recommending and approving the Self-Dealing Transactions,

25  defendants breached those duties by engaging in a transaction that: (1) was fundamentally unfair

26  to the Plaintiffs and the class; (2) disproportionally benefitted the Controlling Shareholders to the

27  direct and complete detriment of the minority shareholders; (3) had no legitimate business reason

28  other than to transfer equity value of the minority shareholders to the Controlling Shareholders.

**COMPLAINT**

1      117.    Having breached their fiduciary duties by causing the Company to approve and

2  complete the Self-Dealing Transactions on fundamentally unfair terms, the Controlling

3  Shareholders then further breached their fiduciary duty to disclose all material facts concerning

4  transactions in which they had a financial interest.

5      118.    DOES 1 to 50 breached fiduciary duties owed to the Plaintiffs by and are therefore

6  equally liable to the Plaintiffs to the same extent as the Controlling Shareholders.

7      119.    In contemplating, planning and/or effecting the Self-Dealing Transactions, the

8  Controlling Shareholders and DOES 1 to 50 were not acting in good faith toward Plaintiffs and

9  breached their fiduciary duties to Plaintiffs.

10      120.    As a result of the Controlling Shareholders, and DOES 1 to 50's wrongful conduct,

11  Plaintiffs were damaged in an amount to be determined at the time of trial.

12                        **THIRD CAUSE OF ACTION**

13           **[Constructive Fraud against All Defendants, including Does 1 to 50]**

14      121.    Plaintiffs adopt and incorporate by reference ¶ 1 through ¶120 above, inclusive.

15      122.    The Individual Defendants, NSC, the Controlling Shareholders, and DOES 1 to 50

16  did the acts recited herein knowingly or with reckless disregard for the consequences, with the

17  intent to harm, deceive and defraud Plaintiffs, and did these acts with the intent to induce reliance

18  as alleged.

19      123.    Plaintiffs placed reliance on the Individual Defendants, NSC, the Controlling

20  Shareholders, and DOES 1 to 50 until Plaintiffs discovered that the Self-Dealing Transactions

21  were sham transactions designed to expropriate the entire value of the Company for the preferred

22  shareholders.

23      124.    The Self-Dealing Transactions reduced the value of minority shareholders' interest

24  in the Company by a reverse stock split of 20:1 and then converted loans held by the Controlling

25  Shareholders into preferred stock at a below market price which enabled the Controlling

26  Shareholders to obtain nearly 80% of the equity value of the Company.

27  //

28  //

125.   As a direct and proximate result of the Individual Defendants, NSC, the Controlling Shareholders, and DOES 1 to 50's conduct, Plaintiffs suffered damages in an amount to be determined at the time of trial.

126.   The Individual Defendants, NSC, the Controlling Shareholders, and DOES 1 to 50's conduct as above alleged was willful, wanton, and in reckless disregard for the rights, property, and interest of Plaintiffs, by reason of which they should be held liable for reasonable exemplary, or punitive damages for purposes of punishment and example all in an amount to be determined at trial.

## IX.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request judgment as follows:

1.   Declaring that the Controlling Shareholders, NSC, the Individual Defendants and DOES 1 to 50 have breached their fiduciary duties;

2.   Awarding Plaintiffs their compensatory damages;

3.   Awarding Plaintiffs exemplary or punitive damages;

4.   Awarding Plaintiffs pre-judgment and post-judgment interest, as well as reasonable attorneys' and experts' fees, and costs; and

5.   Awarding such other and further relief as the Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury as to every issue so triable.

Dated: February 1, 2007

By: _____

Kenneth J. Catanzarite, *of*
Catanzarite Law Corporation *and for*
The Rosen Law Firm, P.A.

No.
CLC: 51900.301.01

EXHIBIT "4"

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name and Address):*                                    TELEPHONE NO.: | FOR COURT USE ONLY |
|---|---|
| BRYAN D. SAMPSON, ESQ. (#143143)          (619)557-9420<br>SAMPSON & ASSOCIATES<br>2139 FIRST AVENUE<br>SAN DIEGO, CA 92101 | *(court stamp)*<br>FILED<br>CIVIL BUS... CED 1<br>CENTRAL DIVISION<br>07 AUG -8 PM 12:40<br>CLERK-SUPERIOR COURT<br>SAN DIEGO COUNTY, CA |

ATTORNEY FOR LIEN CLAIMANT:  RICHARD WILLIAMSON, SUCCESSOR

NAME OF COURT:  SUPERIOR COURT OF CALIFORNIA
STREET ADDRESS:  330 WEST BROADWAY
MAILING ADDRESS:
CITY AND ZIP CODE:  SAN DIEGO, CA 92101
BRANCH NAME:  CENTRAL DIVISION

PLAINTIFF: SHELDON DUBROFF AND MERVYN KLIEN, ET AL.

DEFENDANT:  WREN HOLDINGS, LLC, ET AL.

| | CASE NUMBER: |
|---|---|
| **NOTICE OF LIEN**<br>**(Attachment - Enforcement of Judgment)** | GIC879495 |

ALL PARTIES IN THIS ACTION ARE NOTIFIED THAT

1. A lien is created by this notice under
   a. ☐  Article 3 (commencing with section 491.410) of Chapter 11 of Title 6.5 of Part 2 of the Code of Civil Procedure.
   b. ☒  Article 5 (commencing with section 708.410) of Chapter 6 of Title 9 of Part 2 of the Code of Civil Procedure.
2. The lien is based on a
   a. ☐  right to attach order and an order permitting the creation of a lien (copies attached).
   b. ☒  money judgment.
3. The right to attach order or the money judgment is entered in the following action:
   a. Title of court *(specify):*   UNITED STATES DISTRICT COURT, SOUTHERN DISTRICT OF CALIFORNIA
   b. Name of case *(specify):*  USA V. STRAFACI
   c. Number of case *(specify):*  07 MC 390
   d. ☒ Date of entry of judgment *(specify):*   MAY 26, 2005
   e. ☐  Dates of renewal of judgment *(specify):*

4. The name and address of the judgment creditor or person who obtained the right to attach order are *(specify):*
   RICHARD WILLIAMSON, c/o Sampson & Associates, 2139 First Avenue, San Diego, CA 92101
5. The name and last known address of the judgment debtor or person whose property is subject to the right to attach order are *(specify):*
   EDWARD STRAFACI, 15 LIBERTY KNOLLS, COLTS NECK, NJ 07722
6. The amount required to satisfy the judgment creditor's money judgment or to secure the amount to be secured by the attachment
   at the time this notice of lien is filed is
   $ 89,282,416.00
7. The lien created by this notice attaches to any cause of action of the person named in item 5 that is the subject of this action or proceeding and to that person's rights to money or property under any judgment subsequently procured in this action or proceeding.
8. No compromise, dismissal, settlement, or satisfaction of this action or proceeding or any of the rights of the person named in item 5 to money or property under any judgment procured in this action or proceeding may be entered into by or on behalf of that person, and that person may not enforce any rights to money or property under any judgment procured in this action or proceeding by a writ or otherwise, unless one of the following requirements is satisfied:

   a  the prior approval by order of the court in this action or proceeding has been obtained;
   b. the written consent of the person named in item 4 has been obtained or that person has released the lien; or
   c. the money judgment of the person named in item 4 has been satisfied.

> **NOTICE** The person named in item 5 may claim an exemption for all or any portion of the money or property within 30 days after receiving notice of the creation of the lien.  The exemption is waived if it is not claimed in time.

Date:  August 06, 2007
BRYAN D. SAMPSON, ESQ. (#143143)
*(TYPE OR PRINT NAME)*

▶          *(signature)*

*(SIGNATURE OF LIEN CLAIMANT OR ATTORNEY)*

Form Approved by the<br>Judicial Council of California<br>AT-180, EJ-185 [New January 1, 1985]   **NOTICE OF LIEN**<br>**(Attachment - Enforcement of Judgment)**   Legal Solutions Plus   CCP 491.410, 708.410

BRYAN D. SAMPSON, ESQ. (#143143)
SAMPSON & ASSOCIATES
2139 FIRST AVENUE
SAN DIEGO, CA 92101
Tel.: (619)557-9420
bsampson@sampsonlaw.net

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

USA;                                                     )
RICHARD A. WILLIAMSON, as Successor Liquidating )
Trustee of Lipper Convertibles, L.P.                    )
                          V.                            )         **NO.** 07 MC 390
EDWARD STRAFACI                                         )
                                                        )         **ABSTRACT OF JUDGMENT**
_____                  )

1.    ( x )  Judgment creditor        (   ) Assignee of record applies for an abstract of
             judgment and represents the following:

      a.     Judgment debtor's name and last known address:
             EDWARD STRAFACI, 15 LIBERTY KNOLLS, COLTS NECK, NEW JERSEY 07722


      b.     Driver's license No. and state
             ( x ) unknown
      c.     Social Security number
             ( x ) unknown

<u>BRYAN D. SAMPSON, ESQ. (#143143)</u>
            (Type or Print Name)                              (Signature of Applicant/Attorney)

2.    a.     ( x ) I certify that the following is a true and correct abstract of the judgment
                   entered in this action.
      b.     (   ) A certified copy of the judgment is attached.
3.    Judgment creditor (Name and Address):
      RICHARD A. WILLIAMSON, as Successor Liquidating Trustee of Lipper Convertibles, L.P., c/o Sampson &
      Associates, 2139 First Avenue, San Diego, CA 92101

4.    Judgment debtor (full name as it appears in judgment):
      EDWARD STRAFACI


5.    a.     Judgment entered (date):  <u>MAY 26, 2005</u>
      b.     Renewal entered (date):   _____
      c.     Renewal entered (date):   _____
6.    Total amount of judgment as entered or last renewed: $  <u>89,828,416.00</u>

7.    A stay of enforcement has:
      a.     ( x ) not been ordered by the court
      b.     (   ) been ordered by the court effective until _____ (Date)

Attested:                                              W. Samuel Hamrick, Jr., Clerk

<u>3rd</u> day of <u>August</u>, <u>2007</u>                      By: _____

1  **SAMPSON & ASSOCIATES**
   Bryan D. Sampson, Esq. (#143143)
2  Mary L. Fickel, Esq. (#221872)
   2139 First Avenue
3  San Diego, CA 92101
   Tel. (619) 557-9420 / Fax (619) 557-9425
4  bsampsonlaw@sampsonlaw.net

5  Attorneys for Lien Claimant
   RICHARD WILLIAMSON, SUCCESSOR
6

7

8                **SUPERIOR COURT OF CALIFORNIA**

9            **COUNTY OF SAN DIEGO, CENTRAL DIVISION**

10

| SHELDON DUBROFF and MERVYN KLEIN on behalf of themselves and all others similarly situated, | Case No. GIC 879495 |
|---|---|
| Plaintiffs, | **PROOF OF SERVICE** |
| v. | |
| WREN HOLDINGS LLC, a Delaware limited liability company, et al. | |
| Defendants. | |

17                    **DECLARATION OF SERVICE**

18         I, Natasha Yeakey, declare:

19         I am a citizen of the United States and I am employed in the County of San Diego, State of

20  California. I am over the age of 18 years and not a party to this action. My business address is 2139

21  First Avenue, San Diego, California, 92101.

22         I further declare that I am readily familiar with the business practices of Sampson & Associates

23  for service of documents, which documents served by facsimile are transmitted in and the original

24  deposited with the United States Postal Service in our ordinary course of business on the same day, the

25  documents served by mail are deposited with the United States Postal Service in the ordinary course of

26  business the same day and that documents served personally, are delivered the same day.

27  / / /

28  / / /

SAMPSON & ASSOCIATES
ATTORNEYS AT LAW
2139 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619) 557-9420 · FACSIMILE (619) 557-9425

1    On August 7, 2007, I served the following document:

2        •    **NOTICE OF LIEN; and**

3        •    **ABSTRACT OF JUDGMENT.**

4    on the following:

5
6    Morgan J. Miller                                Barry Sher
     PAUL HASTINGS JANOFSKY & WALKER                 Kevin C. Logue
7    3579 Valley Centre Drive                        Christopher Cobb
     San Diego, CA 92130                             PAUL HASTINGS JANOFSKY & WALKER
8    *Attorneys for Defendants Catalyst Investors,*  Park Avenue Tower
     *L.P. and Christopher Shipman*                  75 East 55th Street
9                                                    New York, NY 10022
                                                     *Attorneys for Defendants Catalyst Investors,*
                                                     *L.P. and Christopher Shipman*
10
11   Mark Hurwitz                                    Jonathan N. Helfat
     LEVY SMALL & LALLAS                             Richard G. Haddad
12   815 Moraga Drive                                OTTERBOURG STEINDLER HOUSTON &
     Los Angeles, CA 90049                           ROSEN, P.C.
13   *Attorneys for Defendants Wren Holdings, LLC,*  230 Park Avenue
     *Javva Partners, LLC, Cameron Family*           New York, NY 10169
14   *Partners, L.P., Andrew Dwyer, Dort A.*         *Attorneys for Defendants Wren Holdings, LLC,*
     *Cameron, III, Howard Katz, Troy Snyder and*    *Javva Partners, LLC, Cameron Family*
15   *Nine Systems Corporation*                      *Partners, L.P., Andrew Dwyer, Dort A.*
                                                     *Cameron, III, Howard Katz, Troy Snyder and*
                                                     *Nine Systems Corporation*
16   Laurence M. Rosen, Esq.                         Kenneth J. Catanzarite
17   THE ROSEN LAW FIRM, P.A.                        Jim Travis Tice
     350 5th Avenue, Suite 5508                      CATANZARITE LAW CORPORATION
18   New York, NY 10118                              2331 West Lincoln Avenue
     *Attorneys for Plaintiffs*                      Anaheim, CA 92801
                                                     *Attorneys for Plaintiffs*
19
     in the following manner of service:

20    **X   By Mail**        I caused such envelopes, with postage thereon fully prepaid, to be placed in the
21                           United States Mail at San Diego, California.

22    ____ **By Fax**        I also caused such documents to be telecopied to the offices of the addressees
                             where indicated.

23       I declare under penalty of perjury under the laws of the State of California, that the foregoing is

24   true and correct. Executed on August 7, 2007, at San Diego, California.

25
26                                                   Natasha Yeakey

27                                                   Natasha Yeakey

28

SAMPSON & ASSOCIATES
ATTORNEYS AT LAW
2139 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619)557-9420 • FACSIMILE (619)557-9425

2

**PROOF OF SERVICE**

EXHIBIT "6"

**SAMPSON & ASSOCIATES**
Bryan D. Sampson, Esq. (#143143)
Mary L. Fickel, Esq. (#221872)
2139 First Avenue
San Diego, California 92101
Tel. (619) 557-9420 / Fax (619) 557-9425
bsampson@sampsonlaw.net

Attorneys for Judgment Creditor
Richard A. Williamson

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD WILLIAMSON, Successor Liquidating Trustee of Lipper Convertibles, LP, <br><br> Plaintiff/Judgment Creditor, <br><br> v. <br><br> EDWARD STRAFACI, <br> . <br><br> Defendant/Judgment Debtor. | Case No. 07 MC 390 <br><br> **ASSIGNMENT ORDER** <br><br><br> Date:  July 14, 2008 <br> Time:  10:30 a.m. <br> Ctrm:  1 <br> Judge: Hon. Irma E. Gonzalez |

The Motion of Judgment Creditor RICHARD WILLIAMSON, Successor Liquidating Trustee of Lipper Convertibles, LP ("Creditor") for an assignment of monies due to Judgment Debtor EDWARD STRAFACI ("Debtor") came before this Court on the above date and time, the Honorable Irma E. Gonzalez, Presiding. Judgment Creditor Williamson appeared through his attorney Bryan D. Sampson, Esq. Judgment Debtor Strafaci did not appear/appeared by _____. The Court having considered the pleadings filed in connection with this motion, the pleadings and records on file int his matter and good cause appearing therefor,

**IT IS HEREBY ORDERED** that the following described rights to payment of Judgment Debtor Edward Strafaci be, and hereby are, assigned to Judgment Creditor Williamson, in care of Sampson & Associates, Attn. Bryan D. Sampson, 2139 1st Avenue, San Diego, California 92101, until such time as the judgment herein is fully satisfied or this order is amended per California Code of Civil Procedure Section 708.560.

SAMPSON & ASSOCIATES
ATTORNEYS AT LAW
2139 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619)557-9420 – FACSIMILE (619)557-9425

1

1    **IT IS HEREBY FURTHER ORDERED** that this assignment order covers any and all accounts

2    receivable, commissions, royalties, bonus plans, stocks, bonds, deferred compensation and/or insurance

3    payments now due, or to become due in the future, to Debtor Strafaci including, but not limited to, any

4    money now due to  him, or to become due in the future, from the class action lawsuit entitled <u>Sheldon,

5    Dubroff and Mervyn Klien, et al. v. Wren Holdings, LLC, et al.</u>, under San Diego Superior Court Case

6    Number GIC879495, until the amount remaining due on the $89,828.416.00 judgment, plus all accrued

7    interest and costs thereon, is paid in full.

8    **IT IS HEREBY FURTHER ORDERED** that Judgment Debtor Edward Strafaci, along with

9    third parties who are served with this notice, shall pay any and all monies due and owing under this order

10    to: "Sampson & Associates, Client Trust Account" at 2139 1ˢᵗ Avenue, San Diego, California 92101 to

11    be applied to this judgment herein until such judgment is fully satisfied or this order is amended.

12    **NOTICE IS HEREBY GIVEN THAT FAILURE BY JUDGMENT DEBTOR EDWARD

13    STRAFACI OR ANY OF THE NOTICED THIRD PARTIES TO COMPLY WITH THIS

14    ORDER MAY SUBJECT THE JUDGMENT DEBTOR OR THIRD PARTY TO BEING

15    SANCTIONED AND/OR HELD IN CONTEMPT OF COURT.**

16    **IT IS SO ORDERED.**

17

18    Dated: _____          _____

19                                                            **JUDGE, U.S. DISTRICT COURT**

20

21

22

23

24

25

26

27

28

SAMPSON & ASSOCIATES
ATTORNEYS AT LAW
2139 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619)557-9420 • FACSIMILE (619)557-9425

2

1   **SAMPSON & ASSOCIATES**
    Bryan D. Sampson, Esq. (#143143)
2   Mary L. Fickel, Esq. (#221872)
    2139 First Avenue
3   San Diego, California 92101
    Tel. (619) 557-9420 / Fax (619) 557-9425
4   bsampson@sampsonlaw.net

5   Attorneys for Judgment Creditor
    Richard A. Williamson
6

7

8                   **UNITED STATES DISTRICT COURT**

9                  **SOUTHERN DISTRICT OF CALIFORNIA**

10  RICHARD WILLIAMSON, Successor          Case No. 07 MC 390
    Liquidating Trustee of Lipper Convertibles, LP,
11                                         **PROOF OF SERVICE**
12           Plaintiff/Judgment Creditor,
                                           Date:   July 14, 2008
13  v.                                     Time:   10:30 a.m.
                                           Ctrm:   1
14  EDWARD STRAFACI,                       Judge:  Hon. Irma E. Gonzalez
    .
15           Defendant/Judgment Debtor.

16

17                   **DECLARATION OF SERVICE**

18          I, Natasha Yeakey,  declare:

19          I am a citizen of the United States and I am employed in the County of San Diego, State of

20  California.  I am over the age of 18 years and not a party to this action.  My business address is 2139

21  First Avenue, San Diego, California, 92101.

22          I further declare that I am readily familiar with the business practices of Sampson & Associates

23  for service of documents, which documents served by facsimile are transmitted in and the original

24  deposited with the United States Postal Service in our ordinary course of business on the same day, the

25  documents served by mail are deposited with the United States Postal Service in the ordinary course of

26  business the same day and that documents served personally, are delivered the same day.

27  / / /

28  / / /

                                        1

On May 23, 2008, I served the following documents:

- **NOTICE OF MOTION AND MOTION FOR AN ASSIGNMENT ORDER;**

- **MOTION FOR AN ASSIGNMENT;**

- **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR AN ASSIGNMENT ORDER;**

- **DECLARATION OF RICHARD A. WILLIAMSON IN SUPPORT OF MOTION FOR AN ASSIGNMENT ORDER;**

- **DECLARATION OF BRYAN D. SAMPSON IN SUPPORT OF MOTION FOR AN ASSIGNMENT ORDER; AND**

- **INDEX OF EXHIBITS IN SUPPORT OF MOTION FOR AN ASSIGNMENT ORDER.**

on the following:

Edward Strafaci  Reg. No. 55609-054
FCI Fort Dix
Federal Correctional Institution
P.O. Box 2000
Fort Dix, NJ 08640

in the following manner of service

**X  By Mail**          I caused such envelope(s), with postage thereon fully prepaid, to be placed in the United States Mail at San Diego, California.

____ **By Fax**          I also caused such document(s) to be telecopied to the offices of the addressees where indicated.

I declare under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.  Executed on May 23, 2008, at San Diego, California.

Natasha Yeakey

SAMPSON & ASSOCIATES
ATTORNEYS AT LAW
2139 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101
TELEPHONE (619)557-9420 • FACSIMILE (619)557-9425

2